# Exhibit 13

*Temporary Staffing/Management/Consulting*
DELTA-T GROUP

November 16, 2000

Ms. Karyl Carter
Employment Tax Specialist
Internal Revenue Service
Department of Treasury
William Green Federal Building
600 Arch Street
Philadelphia, PA 19106

**Re: Delta T Group, Inc.**
**Relief under Section 530**

Dear Ms. Carter:

As promised, the following explains why the above-referenced taxpayer (the "Taxpayer") qualifies for relief under Section 530 of the Revenue Act of 1978 ("Section 530") with respect to its treatment of psychiatry, mental-health, social-work and other allied health professionals ("Professionals") as independent contractors for federal employment-tax purposes.

## I. Background

During 1990 Taxpayer commenced operations in Pennsylvania as a referral agency for self-employed mental health Professionals. From 1990 to 1993, Taxpayer conducted business as a sole proprietorship. On or about January 1, 1993, Taxpayer was incorporated as a closely held private corporation.

Professionals engage Taxpayer to help them in marketing their specialized services ("Services") to clients, while clients who seek those Services engage Taxpayer to help them locate appropriate Professionals.

Taxpayer, itself, does not perform any Services, but rather operates solely as a market facilitator by matching the "supply" with the "demand" for Services. In all respects, Taxpayer is purely a marketing firm. As part of that role, Taxpayer provides an independent verification that a Professional's licenses, if any, are valid and that the Professional passed a background check.

DELTA-T GROUP, INC.
101 South Bryn Mawr Avenue, Suite 270 • Bryn Mawr, PA 19010-3212 • Tele: 610-527-0830 • Fax: 610/527-0833
*Serving Penna., South Jersey and Delaware*

A written Independent Contractor Broker Agreement (the "Agreement") governs Taxpayer's relationship with a Professional, a representative copy of which is enclosed as **Exhibit 1**. The Agreement states that in a consummated referral transaction, a Professional derives its entire compensation from the client that engaged the Professional. The Agreement also requires that Professionals maintain their own liability insurance, provide their own tools, indemnify Taxpayer in the event of loss arising from their performance of Services, and acknowledge that they are responsible for the payment of all federal, state and local taxes that relate to the compensation they receive.

Taxpayer's relationship with a Professional is not exclusive; a Professional always retains the right to market the individual's services through competing referral agencies, directly to consumers or through any other means. Most Professionals market their services through means other than Taxpayer. Many maintain their own private practice and contract with Taxpayer merely to supplement their existing client base.

As made clear by Paragraph 3 of the Agreement, a Professional has absolute discretion to accept or decline engagement opportunities offered by Taxpayer. Furthermore, for any engagement accepted by a Professional, Paragraph 3 provides that the individual and the client separately – and independently – negotiate the hours to be worked.

Consistent with Taxpayer being in the business of marketing, and *not* being involved in any aspect of actually *providing* Services, Taxpayer does not retain the right to exercise any control over the Services performed by a Professional. As expressed in Paragraph 4 of the Agreement:

> CONTRACTOR has the sole right to control and direct the means, manner, and method by which the services required by this Agreement shall be performed.

Similarly, the CLIENT AGREEMENT ("Client Agreement") that Taxpayer enters into with clients, a copy of which is enclosed as **Exhibit 2**, is intended to ensure that clients understand the nature of Taxpayer's "hands-off" relationship with the Professionals who Taxpayer refers to its clients, by stating in Paragraph 1:

> CONTRACTOR is a self-employed independent contractor, responsible for his/her own actions and using his/her best efforts while performing services for CLIENT. DELTA-T shall have no control, direction, supervision, or influence whatsoever over the actions of CONTRACTOR in performing his/her duties for CLIENT.

A principal reason why Taxpayer's agreements with Professionals and clients are so explicit with respect to a Professional maintaining absolute control over all means and methods of performance – and Taxpayer being detached from the performance of any Services – is to differentiate Taxpayer from certain other types of firms that do impose standards or requirements that relate to the care provided. Taxpayer expressly limits its business to marketing and does not involve itself in the relationship between a Professional and a client that Taxpayer refers to the Professional. A copy of this Agreement is enclosed as **Exhibit 2A.**

In comparison, Taxpayer enters into an Employment Agreement with persons whom it treats as employees, such as staffing coordinators, sales persons, human resources professionals, accounting personnel and management.

The following outlines the reasons why, in the instant facts, Taxpayer qualifies for Section 530 protection with respect to its treatment of Professionals as independent contractors. Section 530 provides that if specified requirements are satisfied, a worker shall not be treated as an employee of a business for purposes of federal employment taxes.

## II. Section 530 of the Revenue Act of 1978

Section 530 requires that a taxpayer (1) consistently treat as independent contractors all workers holding positions that are substantially similar to the workers at issue for any period beginning after December 31, 1977 (the "substantive consistency" requirement), (2) report the amount of compensation paid the workers at issue on Forms 1099 during tax periods in question (the "reporting consistency" requirement), and (3) demonstrate that the taxpayer has a "reasonable basis" for treating the workers at issue as independent contractors (the "reasonable basis" requirement).

Each of these requirements, as applied to the instant facts, is analyzed below.

### A. Substantive Consistency Requirement

To satisfy the consistency requirement with respect to a worker, a business must have treated that worker, and all other workers holding a substantially similar position, as independent contractors for all periods ending after December 31, 1978.

The IRS defined the term "treat" in Rev. Proc. 81-18, 1985-1 C.B. 518, as the treatment of workers for purposes of federal tax laws. For these purposes, examples of "treating" a worker as an employee include the withholding of income tax or FICA tax from the individual's wages, or the reporting of compensation received by the individual on Forms 940, 941 or W-2. Rev. Proc 85-18, 1985-1 C.B. 518.

Here, Taxpayer did not withhold or pay any taxes with respect to the amounts received by Professionals, and Taxpayer reported all such amounts on Forms 1099 rather

than W-2. It follows that the Taxpayer treated all Professionals as independent contractors for federal employment-tax purposes.

1. *Identifying "Substantially Similar" Worker*

Taxpayer is affiliated with two categories of workers, namely, (i) the Professionals who engage Taxpayer to assist them in marketing their services, and (ii) Taxpayer's administrative staff who are employed by Taxpayer to perform the background screening and marketing services for the Professionals.

As noted, all Professionals under contract with the Taxpayer are treated as independent contractors. Each Professional is a specialist in one of the five behavioral-health disciplines described below.

i. **Psychiatrists:** Medical doctors versed in the branch of medicine that deals with the prevention, diagnosis, and treatment of mental and emotional disorders.

ii. **Psychologists:** Licensed or non-licensed Professionals with doctorate or master's degrees. There are many areas of specialization in the field, including counseling, research, clinical, and social psychology.

iii. **Therapists:** Professionals who prevent or correct physical, mental, or developmental disorders and provide services that will improve or enhance a person's physical or mental well being. Therapists include social workers, behavioral health specialists, recreational therapists, and mental health therapists. Each type of therapist is described below.

a. *Social workers* – A social worker is usually required to possess a state social-work license or certification to be eligible to render services. Licensed social workers use psychotherapy, prevention and intervention modalities to modify and alleviate disorders.

b. *Behavioral health specialists ("BHS")* – A BHS designs and directs the implementation of a behavioral modification plan, which is individualized to a patient's need. The BHS must be a licensed or non-licensed Psychologist or Master's Level professional who is trained in crisis intervention and behavioral modification.

c. *Recreational therapists* ("CTRS") – These Professionals need a Master's in Creative Arts Therapy (MCAT) or a CTRS certification to practice professionally. A CTRS candidate must hold a minimum of a baccalaureate degree with a major in therapeutic recreation, or a baccalaureate degree in art education, dance, drama, early childhood

education, music education, physical education, psychology, rehabilitation, sociology, or special education plus five years of full-time, paid experience in the field of therapeutic recreation and 18 semester hours of graduate credit in therapeutic recreation.

d. *Mental health therapists* (within the practice of Mental Health Therapy) – These individuals are practitioners of one or more type of mental-health therapy. Various types of therapies exist, some of the more frequent types are, Cognitive, Behavioral, Interpersonal, Psychodynamic, Psychoanalysis, Family and Couple Therapy.

iv. **Counselors:** State certified professionals who work with emotionally disturbed and mentally challenged patients. They organize and conduct group therapy and counseling sessions. Counselors can specialize in certain types of ailments or services.

v. **Psychiatric Nurses (RN):** Licensed professional specialists who have an understanding of patients' social and psychological needs as well as an understanding of the complex science of nursing. He or she also commonly conducts educational programs for patients and their families or performs medical or mental health utilization review services.

The Professionals perform all their Services at a location agreed to by the Professional and the client. Professionals never perform any Services on Taxpayer's premises.

Taxpayer's administrative staff, by contrast, perform all their services on Taxpayer's premises. As noted, these individuals are responsible for performing the background screening and marketing services for the Professionals. They do not perform any case management services or patient evaluations, and they never perform any Services. These individuals represent all of Taxpayer's employees.

According to Rev. Rul. 87-41, 1987-1 C.B. 296, the determination whether a Professional holds a position with Taxpayer that is "substantially similar" to the position held by a member of Taxpayer's administrative staff "requires an examination of all the facts and circumstances, including particularly the activities and functions held and performed by the individuals."

The Small Business Job Protection Act of 1996 (the "1996" Act) made clear that for purposes of determining whether a worker holds a position that is "substantially similar" to another, *one* of the factors to be taken into account is the relationship of the parties, which includes a consideration of the degree of the company's supervision and control of the

worker. Implicit in that clarification, however, is a recognition by the Congress that the more determinative factor is the type of services that each type of worker performs.

As applied to the instant facts, the Professionals and Taxpayer's administrative staff hold positions that are dramatically different from each other, in terms of both (i) degree of control, and (ii) type of services performed. Each factor is analyzed below.

While Taxpayer exercises absolute control over its administrative staff by, among other things, setting the hours of work, requiring that all services be performed on its premises, requiring that they abide by the terms and conditions of an employee handbook and retaining the right to discipline them for violations thereof, Taxpayer does not impose, and has no right to impose, any of those conditions on Professionals. The fundamental reason for this distinction is that Taxpayer's administrative staff provide services for Taxpayer, whereas Professionals perform services for others. As between Taxpayer and a Professional, the only services that one performs for the other are the marketing and screening services that Taxpayer performs for the Professional. It follows, therefore, that from the perspective of Taxpayer's right of control, the positions held by Professionals and Taxpayer's administrative staff are *not* "substantially similar."

With respect to the type of services performed, the same conclusion obtains. As noted, the Professionals provide specialized health-related services to clients, whereas Taxpayer's administrative staff provide marketing and background screening services, as well as general administrative work, for Taxpayer. Accordingly, from the perspective of type of services performed, the positions held by Professionals and Taxpayer's administrative staff are *not* "substantially similar."

The foregoing shows that the positions held by individuals who Taxpayer treats as employees are not substantially similar to the positions held by Professionals. Accordingly, the substantive consistency requirement is satisfied with respect to Taxpayer.

2. ***Predecessor Businesses***

The IRS Training Guidelines state that the consistency requirement must be satisfied with regard to the business at issue and also any predecessor business. *See also* Rev. Proc. 85-18, 1985-1 C.B. 518.

In the instant matter, Taxpayer commenced operations as a proprietorship in 1990 and was incorporated in 1993. When the sole proprietorship was incorporated, the only change was in the business form. The predecessor also treated Professionals as independent contractors and its administrative staff as employees.

Accordingly, the substantive consistency requirement of Section 530 is satisfied with respect to Taxpayer and its predecessor.

**B. Form 1099 Reporting Consistency Requirement**

The second requirement for obtaining relief under Section 530 is that a Taxpayer timely file all required federal tax returns (including information returns) with respect to the workers at issue, for the period at issue, on a basis consistent with the taxpayer's treatment of the workers as independent contractors.

In the instant facts, Taxpayer since its inception has always treated Professionals as independent contractors. For every year of its operations, Taxpayer reported on Forms 1099 all fees received by Professionals from clients referred by Taxpayer. Enclosed, as **Exhibit 3** are copies of the applicable information returns for the year 1998, which you requested.

Although this requirement applies only for the period at issue, according to Rev. Proc. 85-18, section 3.03(B), Taxpayer has consistently filed the required Forms 1099 for every year of operation and for every worker treated as an independent contractor who earned at least $600.

It follows, therefore, that the Form 1099-reporting requirement of Section 530 is satisfied.

**C. Reasonable Basis for Section 530 Protection**

According to Section 530(a)(2), "reasonable basis" for purposes of Section 530 can be established by showing that a taxpayer's treatment of a worker as an independent contractor was in reasonable reliance on (1) legal precedent, (2) a past Internal Revenue Service ("IRS") audit, or (3) a long-standing industry practice. In addition, Rev. Proc. 85-18, 1985-1 C.B. 518, states that a taxpayer who "fails to meet any of the three 'safe havens' may nevertheless be entitled to relief if the taxpayer can demonstrate, in some other manner, a reasonable basis for not treating the individual as an employee."

The courts have liberally construed Section 530 in favor of taxpayers. *E.g., General Investment Corporation,* 823 F. 2d 337 (9th Cir 1987). In *Queensgate Dental Family Practice v. U.S.*, 91-2 USTC 50,536 (D.Pa. 1991), a corporation relied on a Pennsylvania Dental Board decision that licensed dentists could not be treated as employees of a corporation, as a basis for treating dentists as independent contractors. The court held that the taxpayer's reliance on that decision was reasonable for purposes of Section 530.

In the instant facts, Taxpayer's treatment of Professionals as independent contractors was predicated on its reasonable reliance on:

- Legal precedent,
- Industry practice, and

- The following "other manners"

Each of these grounds for establishing a "reasonable basis" for purposes of Section 530 is discussed below.

**1. *Legal Precedent***

In the instant facts, Taxpayer's treatment of Professionals as independent contractors was in reasonable reliance on applicable legal precedent. The relationship between Taxpayer and Professionals is substantively the same as the relationship considered in *In re Serino,* 190 B.R. 778 (Bankr. Pa. 1995) (holding that the treatment of nurses aides and higher-skilled caregivers as independent contractors by a referral agency was correct for federal employment-tax purposes). A detailed analysis of the similarity between the instant facts and those examined in *Serino* is provided below.

Additionally, in *Critical Care Registered Nursing Inc. v. U.S.*, 91-2 USTC 50,481 (DC-PA, 1991), a taxpayer treated as independent contractors specialist registered nurses who it referred to hospitals for temporary additional staffing. The court held that the taxpayer established a reasonable basis for treating the nurses as independent contractors by its reasonable interpretation of the common-law test.

In *Hospital Resource Personnel, Inc. v .United States,* 68 F.3d 421 (11th Cir. 1995) the court confirmed the independent-contractor status of registered nurses ("RNs") and licensed practical nurses ("LPNs") with respect to a referral agency that referred them to hospitals.

Taxpayer's treatment of Professionals also is consistent with Rev. Rul. 61-196, 1961-2 C.B. 155, which concluded that, except when engaged on a full-time salaried basis to perform prescribed routines during fixed hours, RNs, LPNs – and higher-skilled caregivers – generally qualify as independent contractors for federal employment-tax purposes.

In the ruling, IRS differentiated RNs and LPNs from unskilled home aides, concluding that the unskilled workers are less likely to qualify as independent contractors. Inasmuch as the Professionals who engage Taxpayer for help in marketing their services are *as* skilled, or *more highly* skilled, than the RNs and LPNs who were considered in the ruling, the reasonableness of treating Professionals as independent contractors is even more compelling than for the nurses at issue in the ruling.

The authorities discussed above indicate that there is substantial legal precedent supporting a referral agency treating as independent contractors, for federal tax purposes,

highly skilled health professionals who it refers to provide services for clients at health-care institutions. Accordingly, Taxpayer's treatment of Professionals in reasonable reliance on these authorities satisfies the "reasonable basis" requirement of Section 530.

2. *Industry Practice*

The industry practice safe harbor requires a showing of a "long standing" recognized practice of a "significant segment" of the industry treating the workers at issue as independent contractors.

The 1996 Act clarified the industry-practice safe harbor in two significant respects. First, the Act established a safe-harbor definition of *significant segment* as *no more* than twenty-five percent of an industry. Second, the 1996 Act defined the term *long-standing* as referring to a period of no more than ten years.

In *General Inv. Corp. v. U.S.*, 823 F.2d 337 (9th Cir. 1987), the court held that the universe of businesses to be considered for purposes of demonstrating an industry practice should consist only of those that operate in the geographic area where the business at issue operates. In addition, *Sanderson v. United States*, 862 F. Supp. 196 (N.D. Ohio 1994), held that in determining whether an owner-operator trucking business treated its truck drivers in accord with industry practices, other operator businesses should be considered, but not large ICC carriers. The foregoing decisions, taken together, indicate that an industry practice with respect to a company for purposes of section 530 is determined by taking into account only those other businesses that are engaged in a similar type of business in the same geographic area as the company.

The IRS Training Guidelines take the position that a critical requirement of the industry-practice safe harbor provision is that the taxpayer was affirmatively aware of the industry practice at the time it determined to treat workers within that industry as independent contractors. The IRS reasons that a taxpayer could not have relied on an industry practice unless it was aware that the practice existed.

With respect to the requirement that the referral-agency industry have existed for at least 10 years, Taxpayer, itself, establishes proof that this requirement is satisfied, as it has existed for 10 years. In addition, however, prior to the commencement of Taxpayer, Joanne McAndrews (Taxpayer's founder) worked for a company engaged in the same business as Taxpayer. That company was operating more than 10 years ago. Finally, the *Critical Care* decision, discussed above, which was decided during 1991, involved operations of an agency similar to Taxpayer that took place at least 10 years ago. It follows, therefore, that the instant facts satisfy the long-standing requirement.

With respect to the actions taken by McAndrews to ascertain the industry practice at the time she established Taxpayer, some were informal and others more formal. While working for the other similar company and preparing to open her own business, she undertook an informal inquiry as to whether that company's competitors treated the caregivers to whom it referred clients as employees or independent contractors. She found that – like the company for which she worked – all the competitors treated the caregivers as independent contractors. To corroborate that informal observation, she undertook a market survey of the industry. The survey revealed that all the competitors in the region that she identified, such as RN Temps, Foremost, and United Staffing Services treated caregivers as independent contractors. The foregoing demonstrates that at the time that Taxpayer commenced treating Professionals as independent contractors, substantially more than 25 percent of the industry followed that same practice.

Furthermore, Ms. McAndrews used the enclosed Independent Contractor checklist in her analysis prior to making a final determination regarding the characterization of the Professionals. This checklist is enclosed as **Exhibit 4.**

The analysis outlined above demonstrates that Taxpayer's treatment of Professionals as independent contractors, based on the "industry practice," satisfies the reasonable basis requirement of Section 530.

### 3. *Reasonable Reliance on the Advice of a Tax Adviser*

Taxpayer's treatment of Professionals as independent contractors was based also on a reasonable reliance on the advice of its tax advisers. The advice of counsel, knowledgeable about employment taxation issues and familiar with Taxpayer's facts, played a significant role in the Taxpayer's decision to classify the Professionals as it did.

The court in *Smoky Mountain Secrets, Inc. v. United States,* 76 AFTR 2d Par. 95-5509 (1955), held that a taxpayer can establish a reasonable basis for purposes of Section 530 by reasonably relying on the advice of an attorney or accountant. *See also*, *In re Arndt,* 72 AFTR2d No. 93-5325 (Bkrtcy. M.D. Fl. 1993). The *IRS Training Guidelines* at 1-32, confirmed the rule.

In order for professional tax advice to be accepted, a taxpayer must show that: (1) all pertinent facts concerning the taxpayer's relationship with the workers at issue were disclosed to the advisor; (2) the advisor was competent to provide advice concerning a worker's classification; and (3) the advisor advised the taxpayer that its classification of the workers at issue (or substantially similar workers) was properly classified as independent contractors.

---

Taxpayer obtained the advice of three separate attorneys concerning the Professionals' status as independent contractors. First, prior to engaging any Professionals, the Taxpayer retained Edward J. Titterton, Jr., Esquire, to offer his opinion concerning the treatment of Professionals as independent contractors. Based on his review of the agreements and discussions with the owner, he determined that the Professionals qualified as independent contractors. A memorandum prepared by Edward J. Titterton, Jr. Esquire, is attached hereto as **Exhibit 5** in addition to a billing statement, which evidences his representation.

Second, and also prior to the commencement of operations, Taxpayer obtained a second opinion from another attorney, Mike Meehan, Esquire. Mr. Meehan also concluded that the Professionals qualified as independent contractors. Mr. Meehan specifically discussed with McAndrews the protections afforded by Section 530, and concluded that Taxpayer would qualify for Section 530 protection with respect to its treatment of Professionals as independent contractors. An affidavit of Mike Meehan, Esquire, is enclosed as **Exhibit 6.**

Third, prior to the incorporation, Taxpayer obtained another legal opinion from John P. McGuire, Esquire, which concluded that Taxpayer's treatment of Professionals as independent contractors for federal tax purposes was proper. A copy of the opinion is enclosed as **Exhibit 7.**

For each opinion, Taxpayer engaged a business attorney who was knowledgeable about the proper classification of workers, as employees or independent contractors, for federal tax purposes. Furthermore, in each case, Taxpayer met with the attorney, described in detail the intended nature of the arrangement and provided copies of relevant documents.

In addition, Taxpayer has during the past ten (10) years obtained continuing opinions from multiple tax advisers; all of which have confirmed and validated the treatment of Professionals as independent contractors under the current law. A chronology of representation is enclosed as **Exhibit 8**.

Based on the foregoing, another reasonable basis supporting Taxpayer's treatment of Professionals as independent contractors is its reliance on the opinions of its attorneys.

### 4. *Reasonable Interpretation of the Common Law Test*

Taxpayer's treatment of Professionals as independent contractors also is based on Taxpayer's reasonable interpretation of the common-law test. In this regard, the fact that several referral agencies in the same business have prevailed in court on the same issue provides a compelling vindication of the reasonableness of Taxpayer's conclusion that the Professionals qualify as independent contractors under the common-law test. *See, e.g., Critical Care Registered Nursing, Inc. v. United States, 91-2 U.S. Tax Cas. (CCH) (E.D. Pa.*

*1991); Hospital Resource Personnel, Inc. v. U.S., 68 F.3d 421 (11th Cir. 1995); American Inst. Of Family Relations v. United States, 79-1 U.S. Tax Cas. (CCH) (C.D. Cal. 1979).*

As noted, Taxpayer's business is limited to referring client-engagement opportunities to Professionals. Taxpayer is not in any way involved in determining the means or methods by which a Professional performs services for a client. Likewise, Taxpayer does not possess any control over a Professional's time. Professionals have absolute discretion to accept or decline referrals, to work as many or as few hours as they choose, and to pursue new clients through means other than Taxpayer referrals, such as through competing referral agencies and by marketing their services to clients directly. Many Professionals maintain their own private practice and engage Taxpayer merely to help supplement their existing client base.

The instant facts are very similar to the facts at issue in *In re Serino*. As noted, the *Serino* decision involved a referral agency that referred client engagements to RNs, LPNs and nurses' aides. The court, applying the common-law test, held that the workers qualified as independent contractors.

The court's analysis of the common-law factors in *Serino* indicates that the Professionals at issue in the instant facts are independent contractors. The court in *Serino* considered 24 common-law factors and divided them into three categories, namely, (1) degree of control factors; (2) economic factors; and (3) other factors. For the sake of comparison and convenience, the same structure is followed here.

**Degree of Control**

1. Instructions: In *Serino,* the agency referred workers to households and facilities that needed the type of care that a worker provided, but gave no instructions on how to perform the needed care. The court found that this indicated an independent contractor relationship. *In the instant case, Taxpayer is engaged exclusively in the same business, namely referring Professionals to individuals who need the care they provide.*[3] *Professionals receive no instructions from Taxpayer as to how to accomplish an assignment.*

---

[3] The IRS's *Training Materials on Worker Classifications for Tax Purposes as Independent Contractors or Employees*, Training 3320-102 (Rev. 10-96) (Issued Mar. 4, 1997), are instructive on this point. Its discussion of behavioral control contains the following example:

> J is an independent truck driver. J received a call from manufacturing company Y to make a delivery run from the Gulf Coast to the Texas Panhandle. J accepts the job and agrees to pick up the cargo the next morning. Upon arriving at the warehouse, J is given an address to which to deliver the cargo and is advised that the delivery must be completed in two days. *This is direction of what is to be done rather than how it is to be done and is consistent with independent contractor status.*

2. Training: Ms. Serino's agency provided no training. The court presumed this was because prior experience and/or education qualified the workers. *Here, similarly, Taxpayer provides no training.*

3. Hiring, Supervising, and Paying Assistants: The court in *Serino* found that "Ms. Serino was no more than a matchmaker" even though Ms. Serino handled billing and receipts for the workers. The court concluded that these functions were consistent with a worker's independent contractor status. The court placed paramount emphasis on the fact that Ms. Serino did not retain any right to control the hiring and supervision of the workers. Those rights were retained exclusively by the clients. *On this point, the instant facts are indistinguishable from those in Serino.*

4. Set Hours of Work: In *Serino*, the hours of work were set by patient and workers, without participation by Ms. Serino, indicating independent contractor status. *Here, the same relationship exists.*

5. Full Time Required: In Serino, there was no requirement that a caregiver work any specific number of hours. The court noted, however, that the registry would drop from its list workers who decline referrals. *In this case, Professionals may work as many or as few hours as a client and a Professional agree upon. However, in the instant facts, Taxpayer does not drop a Professional from its registry if the Professional refuses referrals.*

6. Doing work on Employer's Premises: The court interpreted its finding that none of the work was done on Ms. Serino's premises as indicating independent-contractor status. *The same is true in the present case.*

7. Order and Sequence of Task Set: The court found that since Ms. Serino did not supervise the workers, she could not set the order or sequence of tasks performed. *This is true in the instant facts as well.*

8. Oral or Written Reports: In *Serino*, the lack of a requirement that reports be submitted was interpreted as indicating independent-contractor status. *In this case as well, Professionals are required only to submit to Taxpayer a report that reconciles hours worked and fees to be paid.*

9. Furnishing of Tools and Materials: Materials such as a uniform were supplied by the worker, not by Ms. Serino. *In this case, any materials needed to complete an engagement are supplied by the Professional (or, possibly, the client), but not Taxpayer.*

---

Training Materials, at 2-11 (emphasis added). That is precisely the situation in the present case.

10. Working for More than One Firm at a Time: Ms. Serino allowed her workers to serve more than one patient at a time, and her workers were allowed to gain referrals through other agencies as well, which the court interpreted as demonstrating independent-contractor status. *In this case, absolutely no restrictions are imposed on a Professional's right to obtain clients by means other than Taxpayer.*

11. Making Services Available to the General Public: According to the court in *Serino,* the fact that Ms. Serino's workers could offer their services to the general public or other registries showed independent-contractor status. *In the instant facts as well, Professionals may offer their services to the general public and through other registries.*

12. Right to Discharge: Ms. Serino had no responsibility or ability to terminate the services of a worker once a referral was made. *The same is true in this case.* Also, while Ms. Serino could remove a worker from her registry if the worker failed to respond to requests for placement, the court determined that this did not equal the right to "fire" a worker. *In this case, Taxpayer does not remove individuals from its registry.*[4]

13. Right to Terminate: In *Serino*, the court found that the worker could terminate his or her position, and would suffer no adverse consequences with the registry. *In this case, if a Professional terminates his or her services prior to the completion of an engagement, the Professional can be liable for contract damages.*

The *Serino* court found that "each and every one of the foregoing factors suggests that the right to control the work was almost entirely absent." *Serino*, 190 B.R. at 783. Similarly, in this case, all 13 of the degree of control factors show a complete absence of control by Taxpayer. According to *Serino*, therefore, the foregoing demonstrates the independent-contractor status of Professionals who obtain client referrals through Taxpayer.

**Economic Factors**

1. Payment by Hour, Week or Month: In *Serino*, the workers were paid on an hourly basis, which the court interpreted as indicating an employer-employee relationship. *In this case, Professionals are paid on an hourly or daily basis.*

2. Payment of Business and/or Travel Expenses: Ms. Serino did not pay travel or businesses expenses, or reimburse for such expenses, which the court found indicated independent contractor status. *The same is true in this case.*

[4] Even if Taxpayer did remove workers from its list for poor performance, as in *Serino*, this still does not indicate employee status. As the Training Materials state, "evaluation systems are used by virtually all businesses to monitor the quality of work performed by workers, whether independent contractors or employees." Training Materials, at 2-14. Consequently, ability to remove for poor performance is not indicative of employee status.

3. Significant Investment: The court in *Serino* found that the workers had made no significant investment in their trade aside from their education, showing an employee-employer relationship. *This can be concluded in this case as well.* Furthermore, according to the IRS *Training Materials*, this is not necessarily indicative of employee status. The *Training Materials* state that, "[i]t should be stressed, however, that a significant investment is not necessary for independent contractor status. *Some types of work simply do not require large expenditures.*" *Training Materials*, at 2-16 (emphasis added).

4. Realization of Profit and Loss: This was not a factor in *Serino* because the pay rates were regulated by a state association. The court found this factor inconclusive. *In this case, the minimum rate of pay that a Professional will accept is the product of negotiation between a Professional and a patient. The actual agreed-upon payment is negotiated by the Professional with the recipient of care. This is different than the facts in Serino, and would weigh stronger in favor of an independent-contractor relationship.*

5. Employer-Type Benefits Provided: Ms. Serino provided no employee-type benefits, such as workers' compensation or life insurance. The court found that this showed an independent contractor relationship. *The same is true in this case.*

In *Serino*, two of these factors indicated an employee-employer relationship, and one was inconclusive. Nevertheless, the court found that the workers were independent contractors. In this case, while the same would be true, the facts here weigh stronger in favor of independent-contractor status, as evidenced by factor 4 above.

**Other Factors**

1. Continuing Relationship: With respect to whether a continuing relationship existed, the *Serino* court reasoned that while some workers may have worked with the registry for significant periods of time, the court did not find evidence of pervasive long-term relationships between workers and the referral agency. *The same is true in this case.*

2. Intent of the Parties – How They View The Relationship: the court found that, despite the lack of a written agreement, both Ms. Serino and the workers considered the relationship to be one of an independent contractor. *In this case, there is the written agreement that clearly describes the relationship as an independent contractor arrangement.*

3. Written, Signed Independent Contractor Agreements: *See above.*

4. Integration: The court found that, without the services of the workers, Ms. Serino would suffer a complete loss of income. *This also is true in this case.*

5. Services Rendered Personally: The court found that the workers in *Serino* utilized their own personal services, showing an employee-employer relationship. *The same is true in this case.*

6. Industry Practice: This *factor was not analyzed by the Serino court. As noted above, the pervasive practice among referral agencies is to treat the nurses to whom referrals are made as independent contractors.*

As is evident from the analysis set forth above, the facts in *Serino* are very similar to the instant facts and, to the extent the facts vary, the instant facts are more compelling in favor of Professionals qualifying as independent contractors. Accordingly, the decision in *Serino* that the workers at issue in that case qualified as independent contractors for the purpose of federal taxes supports a similar conclusion in the instant facts.

The foregoing demonstrates that Taxpayer's treatment of Professionals as independent contractors represents a reasonable interpretation of the common-law test. Accordingly, Taxpayer's reliance on its application of the common-law test constitutes another reasonable basis for purposes of Section 530.

## III. Conclusion

The foregoing shows that in addition to satisfying the substantive consistency requirement and the Form 1099-reporting requirement of Section 530, Taxpayer satisfies the "reasonable basis" requirement four different ways, each of which – standing alone – would be sufficient. Consequently, Taxpayer submits that with respect to the Professionals at issue here, Taxpayer qualifies for Section 530 protection.

If you have any questions concerning the foregoing or need any additional information concerning Taxpayer's qualification for protection under Section 530, please let us know.

Sincerely yours,

RPatel

Rachana Patel