# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEMI BAMGBOSE, individually and on behalf of other similarly situated individuals, | : |
| | : |
| Plaintiff, | : Case No. 2:09-CV-00667-MAM |
| | : |
| v. | : |
| | : |
| DELTA-T GROUP, INC., its predecessors, successors, subsidiaries, and/or assigns, DELTA-T GROUP SOCIAL SERVICE, STAFFING, INC. and DOES 1 through 4, | : |
| | : |
| Defendants. | : |

## DEFENDANT'S MEMORANDUM IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR FLSA CONDITIONAL COLLECTIVE ACTION
## <u>CERTIFICATION AND JUDICIAL NOTICE</u>

Gerald L. Maatman, Jr. (*admitted pro hac vice*)
gmaatman@seyfarth.com
Devjani Mishra
dmishra@seyfarth.com
Kenneth Sulzer (*admitted pro hac vice*)
ksulzer@seyfarth.com
Brandon L. Spurlock (*admitted pro hac vice*)
bspurlock@seyfarth.com

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
212-218-5500
212-218-5526 (fax)

ATTORNEYS FOR DEFENDANT

## TABLE OF CONTENTS

I.     SUMMARY OF ARGUMENT ................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................3

       A.   There Are More Than 20,000 Professionals Registered With Delta-T
            And Its Affiliates Who Provide Various Behavioral Healthcare
            Services In A Myriad Of Circumstances ................................................3

       B.   Delta-T Exercises No Supervision Or Control Over The Professionals'
            Provision Of Behavioral Healthcare Services..........................................6

       C.   Professionals Who Register With Delta-T Enter Into An Independent
            Contractor Services Agreement ...............................................................8

       D.   Delta-T Provides A Limited Range Of Services To Independent
            Contractors..............................................................................................10

       E.   The Behavioral Healthcare Industry Is Particularly Suited For The
            Utilization Of Independent Contractors.................................................11

       F.   Statistical Analysis Of Relevant Data Establishes That Members Of
            The Proposed Collective Action Are Not Similarly Situated ................12

III.   THE APPROPRIATE STANDARD OF REVIEW ..........................................16

       A.   Significant Discovery Has Taken Place In This Litigation ...................19

       B.   Conditional Certification Is Not Automatic; Plaintiff Relies On The
            Wrong Standard For His Motion, As Substantial Discovery Has
            Occurred, And A Stricter Analysis Applies............................................20

IV.    LEGAL ARGUMENT.......................................................................................23

       A.   Plaintiff's Motion Is Defective On Its Face...........................................23

       B.   Plaintiff Cannot Establish That The Behavioral Healthcare
            Professionals In The Proposed Nationwide Collective Action Are
            Similarly Situated...................................................................................24

            1.   Plaintiff Fails To Posit A Viable Claim Based On An Alleged
                 Illegal Policy .................................................................................25

            2.   Determination Of Independent Contractor Status Cannot Be
                 Adjudicated In A Collective Manner...............................................26

i

    3.      The Myriad Declarations Submitted To The Court By The Parties Highlight That Potential Collective Action Members Are Not Similarly Situated..........................................................33

C.      This Court Should Deny Plaintiff's Motion For The Additional Reason That He Is An Inadequate Representative ............................................................40

D.      This Court Should Deny Plaintiff's Motion For The Additional And Independent Reason That Fairness And Procedural Considerations Make A Collective Action Improper ....................................................41

     1.      Plaintiff's Proposed Collective Action Is Unmanageable .........................41

     2.      This Case In Also Unmanageable As A Collective Action Because Forcing Delta-T To Defend It Would Violate Its Constitutional Rights ...............................................................44

     3.      This Court Should Not Impose The Significant Burden And Costs Of A Nationwide Collective Action On The Parties.......................45

E.      Delta-T's Response To The Internal Revenue Service And Department Of Labor Audits Do Not Support Plaintiff's Claim That Putative Collective Action Members Are Similarly Situated ...............................................46

V.      CONCLUSION....................................................................................48

CH1 11793705.2

# TABLE OF AUTHORITIES

Page(s)

CASES

*Adams v. Inter-Con Sec. Sys., Inc.*,
   242 F.R.D. 530 (N.D. Cal. 2007)..........................................................................25

*Aguirre v. SBC Communications, Inc.*,
   No. 05-3198, 2007 U.S. Dist. LEXIS 17259 (S.D. Tex. March 12, 2007).............18

*American National Fire Insurance Co. v. York County*,
   No. 08-2439, 2009 WL 2385464 (1st Cir. Aug. 5, 2009).......................................45

*Baker v. Flint Eng'g & Const. Co.*,
   137 F.3d 1436 (10th Cir. 1998) .............................................................................30

*Basco, et al. v. Wal-Mart Stores, Inc., et al.*,
   No. 00-3814, 2004 U.S. Dist. LEXIS 12441 (E.D. La. July 2, 2004) ....................45

*Bayles v. Am. Med. Response of Colorado, Inc.*,
   950 F. Supp. 1053 (D. Colo. 1996).......................................................................43

*BMW v. Gore*,
   517 U.S. 559 (1996)..............................................................................................44

*Bosley v. Chubb Corp.*,
   No. 04-4598, 2005 WL 1334565 (E.D. Pa. June 3, 2005)....................................16

*Bouaphakeo v. Tyson Foods, Inc.*,
   564 F. Supp. 2d 870 (N.D. Iowa 2008)..................................................................22

*Brooks v. AT&T, Inc.*,
   No. 07-3054, 2009 U.S. Dist. LEXIS 20552 (N.D. Ga. Feb. 10, 2009) ................18

*Brown v. Money Tree Mortgage, Inc.*,
   222 F.R.D. 676 (D. Kan. 2004)..............................................................................40

*Bunyan v. Spectrum Brands, Inc.*,
   No, 07-89, 2008 U.S. Dist. LEXIS 59278 (S.D. Ill. July 31, 2008) ......................22

*Coleiro v. Spartan Stores, Inc.*,
   No. 02-150, 2004 WL 3951586 (W.D. Mich. Aug. 16, 2004) ...............................24

*Davis v. Charoen Pokphand (USA), Inc.*,
   303 F.Supp. 2d 1272 (M.D. Ala. 2004) .................................................................17

*Diaz v. Electronics Boutique of America*,
   No. 04-840, 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ...................................27

iii

*Dreyer v. Altchem Env. Servs. Inc., et al.*,
   No. 06-2393, 2006 U.S. Dist. LEXIS 93846 (D.N.J. Dec. 12, 2006)....................................45

*EEOC v. MCI Int'l, Inc.*,
   829 F. Supp. 1438 (D.N.J. 1993) ..........................................................................................45

*Exxon Shipping Co. v. Baker*,
   120 S.Ct. 2605 (2008)...........................................................................................................44

*Freeman v. Wal-Mart Stores, Inc.*,
   256 F. Supp. 2d 941 (W.D. Ark. 2003)....................................................................21, 42, 45

*Hinojos v. The Home Depot, Inc.*,
   No. 06-108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) .......................................................36

*Hoffman v. Sbarro, Inc.*
   982 F. Supp. 249 (S.D.N.Y. 1997).........................................................................................40

*Hoffmann-La Roche Inc. v. Sperling*,
   493 U.S. 165 (1989)..........................................................................................................20, 42

*Hohider v. United Parcel Services, Inc.*,
   No. 07-4588, 2009 U.S. App. LEXIS 16395 (3d Cir. July 23, 2009) ...................................41

*Holt v. Rite Aid Corp.*,
   333 F. Supp. 2d 1265 (M.D. Ala. 2004) ................................................................................18

*In Re FedEx Ground Package System, Inc. Empl. Prac. Litigation*,
   No. 05-527 (MDL-1700), 2009 WL 2242231 (N.D. Ind. Jul. 29, 2009)....................27, 28, 29

*In Re Hydrogen Peroxide Antitrust Litigation*,
   552 F.3d 305 (3d Cir. 2008)...................................................................................................42

*In Re Wal-Mart Wage and Hour Empl. Prac. Litigation*,
   No. 06-225, 2008 U.S. Dist. LEXIS 50928 (D. Nev. June 20, 2008)....................................24

*In Re Wells Fargo Mortgage*,
   571 F.3d 953 (9th Cir. 2009) ...........................................................................................27, 47

*Johnson, et al. v. Big Lot Stores, Inc.*,
   561 F. Supp. 2d 567 (E.D. La. 2008) .....................................................................................43

*King v. West Corp.*,
   No. 04-318, 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006)........................................29

*Maddock v. KB Home, Inc.*,
   248 F.R.D. 229 (D.C. Cal. 2007) ...........................................................................................44

iv

*Martin v. Selker Bros., Inc.*,
    949 F.2d 1286 (3d Cir. 1991) ....................................................................................... 30

*McLaughlin v. American Tobacco*,
    522 F.3d 215 (2d Cir. 2008) ........................................................................................ 44

*Mike v. Safeco Ins. of America*,
    223 F.R.D. 50 (D. Conn. 2004) .............................................................................. 23, 26

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
    111 F. Supp. 2d 493 (D.N.J. 2000) ............................................................ 21, 22, 23, 25, 26

*Mueller v. CBS, Inc.*,
    200 F.R.D. 227 (W.D. Pa. 2001) .................................................................................. 24

*Norris-Wilson, et al., v. Delta-T Group, Inc.*,
    Case No. 09-CV-916 (S.D. Cal.) ................................................................................. 17

*Nudell v. Burlington & Santa Fe Rwy. Co.*,
    No. 01-41, 2002 WL 1543725 (D.N.D. July 11, 2002) .......................................................... 24

*Pfaahler v. Consultants for Architects, Inc.*,
    No. 99-6700, 2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 8, 2000) ..................... 26, 27, 28, 29

*Philip Morris v. Williams*,
    549 U.S. 346 (2007) .................................................................................................. 44

*Purdham v. Fairfax County Pub. Schs.*,
    No. 09-50, 2009 U.S. Dist. LEXIS 52781 (E.D. Va. June 22, 2009) ...................................... 22

*Rincon v. B.P. Security & Investigations, Inc.*,
    No. 06-538, 2006 WL 3759872 (S.D. Tex. Dec. 19, 2006) .................................................. 21

*Robinson v. Sheriff of Cook County*,
    167 F.3d 1155 (7th Cir. 1999) ..................................................................................... 41

*Roussell v. Brinker International, Inc.*,
    No. 05-3733, 2008 U.S. Dist. LEXIS 52568 (S.D. Tex. July 9, 2008) .................................... 43

*Saleen v. Waste Management, Inc.*,
    No. 08-4959, 2009 U.S. Dist. LEXIS 49891 (D. Minn.
    June 15, 2009) ....................................................................................... 16, 21, 41, 45, 46

*Sepulveda v. Wal-Mart Stores, Inc.*,
    237 F.R.D. 229 (C.D. Cal. 2006), *rev'd on other grounds*, 275 Fed.Appx. 672 (9th
    Cir. 2008) ............................................................................................................... 36

v

*Smith v. Sovereign Bancorp, Inc.*,
   No. 03-2420, 2003 U.S. Dist. LEXIS 21010 (E.D. Pa. Nov. 13, 2003) ................................21

*State Farm v. Campbell*,
   528 U.S. 408 (2003).........................................................................................................44

*Stone v. Pinkerton Farms, Inc.*,
   741 F. 941 (7th Cir. 1984) ...............................................................................................30

*Trinh v. J.P. Morgan Chase & Co.*,
   No. 07-1666, 2008 WL 1860161 (S.D. Cal. Apr. 22, 2008)....................................................25

*Valcho v. Dallas County Hospital District*
   574 F.Supp. 2d 618 (N.D. Tex. 2008) ...............................................................................17

*Villanueva-Bazaldua v. TruGreen Ltd. Partners*,
   479 F. Supp. 2d 411 (D. Del. 2007).....................................................................................21

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) .......................................................................................27, 46

*Walker v. Bankers Life & Casualty Co.*,
   No. 06-6906, 2008 U.S. Dist. LEXIS 60593 (N.D. Ill. July 28, 2008)....................................26

*Walker v. Washbasket Wash. & Dry*,
   No. 99-4878, 2001 U.S. Dist. LEXIS 9309 (E.D. Pa. July 5, 2001).................................26, 30

*West v. Border Foods, Inc.*,
   No. 05-2525, 2006 U.S. Dist. LEXIS 96963 (D. Minn. June 12, 2006)................................25

*White v. Osmose, Inc.*,
   204 F. Supp. 2d 1309 (M.D. Ala. 2002) .........................................................................23, 40

*Williams v. Accredited Home Lenders, Inc.*,
   No. 05-1681, 2006 WL 2085312 (N.D. Ga. July 25, 2006) ...............................18, 22, 36, 40

## STATUTES

29 U.S.C. § 2072 (b) .............................................................................................................44

29 U.S.C. § 201......................................................................................................................1

29 U.S.C. § 216 (b) ...................1, 17, 18, 19, 20, 21, 22, 26, 27, 28, 29, 36, 37, 40, 42, 43, 44, 45

Defendant Delta-T Group, Inc. ("Delta-T"), by and through its attorneys, Seyfarth Shaw LLP, hereby submits its Memorandum In Opposition To Plaintiff's Motion For FLSA Conditional Collective Action Certification And Judicial Notice.

## I.    SUMMARY OF ARGUMENT

Plaintiff Temi Bamgbose seeks to represent thousands of professionals who perform hundreds of different job functions within numerous segments of the behavioral healthcare industry.  These professionals operate as independent contractors and register with Delta-T, or one of its affiliates, to receive referrals for independent contractor opportunities.  Plaintiff alleges that all of these professionals – regardless of profession, licensing, or work activities – are misclassified as independent contractors and are actually employees for purposes of overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* based on this premise alone.  After seven months of extensive discovery, Plaintiff seeks conditional certification under § 216 (b) and authorization to send notice of the lawsuit to more than 20,000 behavioral healthcare professionals throughout the country.

Delta-T submits that this Court should deny Plaintiff's motion for five separate and independent reasons.  First, Plaintiff's motion should be denied because his proposed class definition is defective as a matter of law in that it is dependent upon the Court's future determination of the merits.  Plaintiff's motion manifests the inherent incompatibility of Plaintiff's case theory – as to the economic realities underlying the factual circumstances of thousands of healthcare professionals and their myriad interactions with clients – and determination of such issues in a collective action.

Second, Plaintiff cannot show, as a matter of law, that he and all of the behavioral healthcare professionals in the proposed nationwide collective action are "similarly situated." Contrary to Plaintiff's theory of the case, the mere fact that Delta-T classifies all members of the

putative collective action as independent contractors does not support a determination that they are all "similarly situated."  In fact, courts around the country consistently have rejected Plaintiff's argument, recognizing instead that such cases involve fact-intensive, highly individualized inquiries.

Third, on the factual record before this Court, Plaintiff is not similarly situated to the expansive universe of individuals he seeks to include in the putative collective action. Specifically, notwithstanding the fact that he personally only provided services as a "Residential Aide" and "Case Manager" in a handful of settings, Plaintiff seeks to conditionally certify a nationwide collective action involving each and every professional engaged with Delta-T.  The proposed group would include individuals who provide professional services in numerous different behavioral healthcare categories including psychiatry/psychology, nursing, counseling, child and family treatment, special education, behavioral health, and therapy.  They provide services in widely disparate circumstances at numerous different types of facilities including community centers, individual family homes, shelters, correctional facilities, drug and alcohol rehabilitation facilities, schools, military institutions, foster care facilities, child care centers, independent living centers, psychiatric facilities, and hospitals.  Moreover, the proposed group of professionals have differing job titles, duties and responsibilities, contract arrangements, schedules, education levels, skill sets, licensure requirements, training, and geographical locations – not only different than Plaintiff, but also different than each other.  Suffice it to say, Plaintiff cannot fit a square peg in a round hole – the record demonstrates conclusively that the legal and factual issues relative to the proposed class are not capable of collective action treatment.

CH1 11793705.2

Fourth, the record evidence before the Court shows that Plaintiff is an inadequate representative of the class of putative collective action members.  The weakness of his claims and the differences between his claims and those of the putative collective action members are additional reasons this Court should deny Plaintiff's motion.

Fifth, the proposed collective action would not be manageable or efficient.  Instead, the case necessarily would devolve into thousands of mini-trials, each separately grappling with the individualized nuances of the professionals' circumstances as they relate to the multi-factor economic realities test for employee status under the FLSA.  Collective action certification of Plaintiff's claim would raise a host of litigation management obstacles, some of which would present due process and Rules Enabling Act violations.  Given the inevitable imposition of the significant burdens and costs of a nationwide collective action, Plaintiff's motion should be denied.

## II.   FACTUAL BACKGROUND

### A.   There Are More Than 20,000 Professionals Registered With Delta-T And Its Affiliates Who Provide Various Behavioral Healthcare Services In A Myriad Of Circumstances

Delta-T is not a Fortune 500 company, but a family business owned by a mother and her two sons.  (S. McAndrews Dep. Tr. at 5, 19, 20).[1]  It is a small company with approximately 75

---

[1] The depositions and declarations cited herein are attached to the contemporaneously filed Appendix of Exhibits in Support of Defendant's Memorandum In Opposition To Plaintiff's Motion For FLSA Conditional Collective Action Certification And Judicial Notice (the "Appendix").  The deposition transcript of Scott McAndrews is attached to the Appendix as Exhibit B-4.  In addition to the depositions and declarations of Delta-T personnel, which are separately attached to the Appendix, Delta-T has submitted 83 declarations from independent behavioral healthcare professionals who have accepted referrals from Delta-T.  For the Court's convenience and for ease of reference, Delta-T has prepared an index of the professionals' declarations (the "Index").  The Index (at Section A therein), a copy of which is attached to the Appendix as Exhibit G-1, lists the declarants by name, category, education, occupation, and state.  The Index - at Section B therein - also categorizes the declarants by key facts addressed in the declarations.  The declarations themselves are attached to the Appendix in alphabetical order as Exhibits G-2 though G-84.  The depositions – and the pertinent pages therefrom – are attached to the Appendix as Exhibits B-1 to B-6.

CH1 11793705.2

individuals employed at its headquarters.  (S. McAndrews Decl. ¶ 1).  Delta-T serves as a referral

agency for independent contractor services in the behavioral healthcare industry.  (S.

McAndrews Decl. ¶ 2).  As a referral agency for independent contractors, Delta-T's engagements

are two-fold: (1) Delta-T contracts with clients seeking behavioral healthcare professionals, and

(2) Delta-T contracts with professionals seeking referrals to a myriad of behavioral healthcare

facilities.  (S. McAndrews Decl. ¶ 2).  In this respect, Delta-T serves as a broker to match

independent behavioral healthcare professionals with clients in need of their services.

(Calcaterra Decl. ¶ 8; S. McAndrews Decl. ¶ 2).  Delta-T acts solely as a referral agency and

does not perform or provide any behavioral healthcare services, and is not licensed to do so.

(Calcaterra Decl. ¶¶ 10-13;  S. McAndrews Decl. ¶ 2; Ex G - Index §§ B 1, 2).

Delta-T has 12 affiliates, with active operations located in Maryland, New Jersey,

Massachusetts, Illinois, Virginia, Connecticut, Michigan, California, and Arizona.  (S.

McAndrews Dep. Tr. at 40-42).  They are independent corporations, and have their own

management and organizational structure.  (S. McAndrews Decl. ¶ 3).  The entities were formed

in this manner to facilitate their entrepreneurial potential and to allow each office to build their

markets autonomously and in line with geographic demands and marketplace developments.  (S.

McAndrews Decl. ¶ 3).  Moreover, educational and licensure, training, and certification

requirements for professionals vary from state to state.  (O'Brien Decl. ¶ 9).

More than 20,000 independent professionals are registered with Delta-T or its affiliates

across the country.  (S. McAndrews Decl. ¶ 4).  A sampling of the types of client facilities at

which the professionals provide their services includes, but is not limited to the following

behavioral healthcare categories: (1) psychiatry/psychology; (2) nursing; (3) counseling; (4)

child and family treatment; (5) special education; (6) behavioral health; and (7) therapy.  (S.

McAndrews Decl. ¶ 4; s*ee* generally, Ex. G - Index § A).  Within these behavioral healthcare categories there are dozens of different job titles and functions.  (S. McAndrews Decl. ¶ 4; s*ee* generally, Ex. G - Index § A; O'Brien Decl., Exhibit 1).  The facilities at which the professionals provide their services include outpatient clinics, hospitals, psychiatric inpatient facilities, residential treatment facilities, correctional facilities, individual family homes, community centers, long-term care facilities, shelters, drug and alcohol rehabilitation facilities, schools, military institutions, foster care facilities, child care centers, and independent living centers.  (S. McAndrews Decl. ¶ 5; O'Brien Decl., Exhibit 1).

Each professional is unique and their specific situation varies depending on multiple factors including, but not limited to the following:

- Different education levels

- Different skill sets

- Different occupations

- Different licensure and certification requirements

- Different positions

- Different clients

- Different duties and responsibilities

- Different work settings

- Different contractual arrangements

- Different methods of compensation

- Different work schedules

(*See* generally, Ex. G - Index §§ A, B; O'Brien Decl. ¶¶ 8-12 and Exhibit 1 thereto; Calcaterra Decl. ¶¶ 12-14, 18, 19; S. McAndrews Decl. ¶¶ 4, 5).

Moreover, professionals register with Delta-T for different reasons.  (Ex. G - Index §§ B 19-22).  For example, some professionals maintain full or part-time employment, but register with Delta-T as a means to accept independent contractor opportunities to supplement their income.  (Ex. G - Index §§ B 19-22).  Other professionals simply seek opportunities to provide services on individual projects allowing for the flexibility to attend school, take care of their families, or have time for other interests.  (Ex. G - Index § B 19).  A number of these professionals have their own independent practice and engage Delta-T to supplement their practice through different referral opportunities.  (Index § B 20).  Some professionals serve as consultants within their professional sector and utilize Delta-T to expand their client base and gain experience in different settings.  (Ex. G - Index § B 20).  Other professionals are registered on multiple registries in addition to Delta-T, and accept referrals from various sources that provide them with flexibility and variety in their provision of professional services.  (Ex. G - Index § B 22).  For each of these reasons, no two members of the putative collective action are alike or otherwise similarly situated.

### B.     Delta-T Exercises No Supervision Or Control Over The Professionals' Provision Of Behavioral Healthcare Services

Professionals are free to accept or reject opportunities offered by Delta-T.  (Calcaterra Decl. ¶ 14; S. McAndrews Decl. ¶ 6; Ex. G - Index § B 3).[2]  Professionals set their own

---

[2] Plaintiff asserts that Delta-T Staffing Coordinators determine whether the professionals are "qualified" (Pl. Mem. at 8).  This is inaccurate.  Delta-T Staffing Coordinators do not evaluate, hire, place, or schedule the professionals. (Calcaterra Decl. ¶¶ 10, 12).  Rather, they receive referral opportunities from clients and offer these referrals to registered professionals who have the requisite credentials and skill set.  (Calcaterra Decl. ¶¶ 8, 10, 12). Consummation of the referral is contingent upon the client accepting the professional as "qualified." (Calcaterra Decl. ¶ 12).  Moreover, the Staffing Coordinator does not dictate an independent professional's schedule or compensation.  Instead, at most, the Staffing Coordinator may communicate information to the professional on behalf of the client about the number of hours available for independent contractor service and the compensation arrangements being offered by the client. (Calcaterra Decl. ¶ 10).  However, the professional is free to discuss compensation and scheduling issues directly with the client. (Calcaterra Decl. ¶ 14; Ex. G - Index §§ B 13, 14).

6

schedules and control their own work hours.  (Calcaterra Decl. ¶¶ 19-21; S. McAndrews Decl. ¶ 6; Ex. G - Index § B 13).  If a professional accepts a referral opportunity presented by Delta-T, he or she performs the professional services at the client facility or other location specified by the client.  (S. McAndrews Decl. ¶ 6).  The professional never performs any services on Delta-T's premises.  (S. McAndrews Decl. ¶ 6).[3]

Professionals and clients recognize Delta-T's limited role as a referral service. (Calcaterra Decl. ¶ 17; Ex. G - Index §§ B 1-6, 13-16).  In fact, the clients are expressly informed that Delta-T lacks the expertise to supervise, instruct, or train the professionals with respect to their professional duties and responsibilities.  (S. McAndrews Decl. ¶ 11).  In many situations, state licensing laws would prevent Delta-T from doing so.  This also varies by location and profession.  Moreover, Delta-T has no right or power to interfere in a client-professional relationship once a referral has been consummated.  (Calcaterra Decl. ¶¶ 23-26; S. McAndrews Decl. ¶ 12).  It cannot, for example, reassign a professional from one client to another or terminate a professional from a client engagement.[4]  (Calcaterra Decl. ¶¶ 23-26; S. McAndrews Decl. ¶ 12).  Only a client or the professional can terminate an engagement.  (Calcaterra Decl. ¶¶ 24-26; S. McAndrews Decl. ¶ 12; Ex. G - Index § B 5).  Contrary to Plaintiff's assertion that Delta-T makes visits to client sites, Plaintiff testified at his deposition that during his 7 years with Delta-T, a Delta-T employee visited the client site only once and she did not tell Plaintiff

---

[3] Delta-T does not provide professionals who register with the company any training, employee handbooks, or manuals. Delta-T does not require professionals who register with the company to comply with a Delta-T dress code nor do such individuals wear a Delta-T uniform or identification badge.  Professionals who register with the company are not requited to attend any Delta-T meetings.  (S. McAndrews Decl. ¶ 7).

[4] Contrary to the assertions contained at page 11 of Plaintiff's Memorandum, the written agreement between Delta-T and professionals does not provide that Delta-T has the authority to terminate a referral once it has been accepted by a professional.  (Calcaterra Decl. ¶ 26).

7

anything about how to do his job or anything else with respect to his work at the facility.  (Pl. Tr. at 140-141).[5]   Further, opt-ins who have given deposition testimony concede that Delta-T does not supervise or control how they provide professional services to clients.[6]  This is a critical factor that distinguishes referral agencies, such as Delta-T, from employment agencies or leasing firms.

### C.     Professionals Who Register With Delta-T Enter Into An Independent Contractor Services Agreement

Delta-T and professionals enter into a written services agreement that sets forth the terms and conditions of the parties' relationship.  ("Services Agreement")  (Calcaterra Decl. ¶ 18; S. McAndrews Decl. ¶¶ 13, 14; Appendix Exhibit 1).[7]  The Services Agreement expressly provides in relevant part as follows:

- Delta-T seeks to engage professionals who have an independent business or occupation and hold themselves out to the public as competent in their professional field.

- Delta-T provides no supervision or control over the professional's services.

- The professional retains the right to market his or her services through other means.

---

[5] The deposition transcript of Plaintiff Bamgbose is attached to the Appendix as Exhibit B-1.

[6] Vonda Norris-Wilson and Abigail Papa are named plaintiffs in the putative class action pending in the U.S. District Court for the Southern District of California raising similar allegations against Delta-T and two of its California affiliates.  (Gerald L. Maatman, Jr. Decl. ¶ 4).  They  have filed notices of consent to join this lawsuit.  (Docket Nos. 2 & 4).  Norris-Wilson testified at her deposition that she received no instruction from and had no interaction with Delta-T regarding her provision of services except an occasional call to inform her about a new opportunity. (Norris-Wilson Dep. Tr. at 60:17-21)  (The deposition transcript of Norris-Wilson is attached to the Appendix as Exhibit B-2).  She further testified that Delta-T never provided her with any training or orientations; nor did Delta-T give her an employee handbook or any written policies. (Norris-Wilson Dep. Tr. at 62: 1-11, 16-17; 87:24-25, 88:1-5).  She did not provide Delta-T with any status reports or progress notes.  (Norris-Wilson Dep. Tr. at 110: 22-24; 111:6-11).  Likewise, Papa testified at her deposition that Delta-T did not provide direction regarding her provision of services.  (Papa Dep. Tr. at 104: 8-12) (The deposition transcript of Papa is attached to the Appendix as Exhibit B-3).  She further testified that Delta-T did not provide any tools, equipment, supplies, office space, training, orientation, handbook, written procedures, and that she did not attend any meetings at Delta-T or submit any progress reports to Delta-T.  (Papa Dep. Tr. at 71: 5-13; 72:17-23; 80: 23-25; 81:1-9; 82:19-25; 83: 8-13).

[7] The Services Agreement, attached to the Appendix as Exhibit 1, has been in place since January 2008.  Earlier versions have been used since the start of Delta-T's operations.  (S. McAndrews Dep. Tr. at 122-125).

8

- The professional is responsible for equipment, tools, materials, transportation, etc.

- The professional represents that he or she has requisite knowledge in their specialized field and that Delta-T does not provide any training.

- After accepting a referral, the professional and the client determine the place and scope of services, not Delta-T.

- The professional is responsible for payment of any insurance, licensing fees, professional dues, etc.; Delta-T does not reimburse for these expenses.

- The professional retains the right to hire employees or assistants at the professional's discretion.

- The professional is responsible for paying his or her own taxes.

- The professional retains absolute discretion whether to accept or decline a referral.

- The professional has the sole right to control and direct the means, manner, and method of services.

Every professional, including Plaintiff and each of the individuals who have opted-in to this case, signed a copy of the Independent Contractor Services Agreement.  (S. McAndrews Decl. ¶ 13).  These contract specifications applied to Plaintiff.  He acknowledged in his deposition that he rejected several referrals.  (Pl. Dep. Tr. at 109).

Plaintiff contends that the Independent Contractor Services Agreement "imposes a blanket, improper classification" on professionals.  (Pl. Mem. at 5).  To the contrary, the document merely sets forth, in an unambiguous way, the relationship between the parties.  In addition, Delta-T takes great effort to ensure that professionals fully understand the nature of the parties' relationship prior to executing the agreement.  (Calcaterra Decl. ¶ 18; S. McAndrews Decl. ¶ 14).

Delta-T utilized counsel to formulate the Independent Contractor Services Agreement at issue in this litigation.  (S. McAndrews Dep. Tr. at 122-126).  The company organized its business model consistent with this advice.  (S. McAndrews Dep. Tr. at 122-126).

9

**D.    Delta-T Provides A Limited Range Of Services To Independent Contractors**

As discussed above, Delta-T serves as a referral agency in the behavioral healthcare industry.  The process for professionals delivering services to clients and receiving compensation entails:

(i).    Delta-T receives a request from a client regarding certain healthcare needs;

(ii).    Delta-T searches its registry for qualified professionals;

(iii).    Delta-T offers the opportunity to one or more qualified professionals;

(iv).    The professional is free to accept or reject the offer;

(v).    If the professional accepts the offer, he or she is put into contact with the client;

(vi).    The professional and client then negotiate over and determine the schedule, scope of responsibilities, and length of contract, and sometimes professionals negotiate the compensation rate directly with the client;

(vii).    The professional provides services on an independent contractor basis to the client, and Delta-T has no part in the professional's provision of services;

(viii).    The professional submits an invoice to Delta-T documenting the services provided (depending on how the client compensates, *e.g.*, on an hourly basis, per project, etc.);

(ix).    Delta-T uses the invoice to generate a bill to the client;

(x).    Delta-T submits a bill to the client, and provides a check for compensation to the professional; and,

(xi).    Delta-T retains the difference between the amount it bills the client with the amount the professional is compensated (and with respect to the client's payment, Delta-T has an ownership interest in the difference between the billing rate and the compensation rate for the professional, but Delta-T never obtains any ownership interest in the professional's compensation).

(*See* Calcaterra Decl. ¶¶ 8-26; S. McAndrews Decl. ¶¶ 6, 7, 16; Comitz Dep. Tr. at 10: 14-18, 65: 10-13 & 74: 1-5).

The company also provides additional services including background screening, credentialing verification, and billing.  (S. McAndrews Decl. ¶ 15).  For example, a client may

require a professional to submit proof that he or she has an updated criminal background check. (S. McAndrews Decl. ¶ 15).  A client also may require third-party verification of the professional's education or qualifications.  (S. McAndrews Decl. ¶ 15).  Although the professional can obtain such documentary proof on his or her own and submit it directly to the client, Delta-T offers the professional the optional service of having the company obtain the requisite documentation on his or her behalf.  If the professional elects this optional service, Delta-T bills the professional accordingly.  (S. McAndrews Decl. ¶ 15).[8]

In the same vein, Delta-T serves as a billing agent for the independent professional. Specifically, the professional submits to Delta-T an invoice documenting the services provided to the client.  Delta-T uses the information contained in the professionals' invoice to generate a bill that is submitted to the client for payment.  Once payment is received from the client, Delta-T provides a check to the professional for the agreed upon amount.  (S. McAndrews Decl. ¶ 16).

### E.     The Behavioral Healthcare Industry Is Particularly Suited For The Utilization Of Independent Contractors

Delta-T's business model as a referral agency for independent professionals corresponds with a market niche within the behavioral healthcare industry.[9]  (S. McAndrews Decl. ¶ 17). Specifically, the behavioral healthcare field is unique in that it requires delivery of comprehensive care to clients who have a wide range of behavioral healthcare needs within

---

[8] As an independent professional the individual is responsible for  his or her own training, licensing, and certifications, as well as the associated costs.  (S. McAndrews Decl. ¶ 8; Ex. G - Index §§ B 1, 2, 4, 17, 18).

[9] Plaintiff's assertion that Delta-T's competitors do not treat workers as independent contractors is inaccurate.  (Pl. Mem. at 5, n. 7).  Attached as Exhibit C-1 to the Appendix is the Declaration of Kevin O'Brien.  Mr. O'Brien holds a Master of Health Science Administration from St. Joseph College of Maine, a Master of Science degree in Systems Management from the University of Southern California, and a B.A. degree in Accounting from Michigan State University.  He has extensive experience providing analyses regarding the behavioral healthcare industry.  (*See* Ex. C-1: O'Brien Decl., ¶¶ 1-4).

11

different settings.  (O'Brien Decl. ¶ 10).  They include various outpatient settings, office based

settings, public and private clinics, psychiatric units of hospitals, specialty hospitals, acute care

facilities, residential treatment facilities, correctional facilities, public sector mental heath

facilities, schools, community centers, and family homes, among others.  Some settings provide

multiple types of services.  (O'Brien Decl. ¶ 10).  As such, use of independent contractors in the

industry is not uncommon.  (O'Brien Decl. ¶ 15).

Complicating matters even further, there are numerous industry segments within the

special mental health sector, the general medical/primary care sector, the human resources

sector, and the voluntary support network sector.  (O'Brien Decl. ¶ 8).  Each segment requires

different services or specialties such as substance abuse and addictions, psychiatry, child welfare,

foster care, juvenile justice, special education, human services, mental retardation, and

development disabilities.  (O'Brien Decl., Exhibit A).  Caregivers of behavioral health services

may provide their services in individual or group environments.  (O'Brien Decl. ¶ 11).  This

fragmented and disjointed system offers the opportunity for a market-facilitator like Delta-T to

link behavioral healthcare professionals with clients needing such services.  (O'Brien Decl. ¶

15).

### F.   Statistical Analysis Of Relevant Data Establishes That Members Of The Proposed Collective Action Are Not Similarly Situated

Representative data[10] drawn scientifically from the Delta-T contractor registry presents a

---

[10] Attached as Exhibit C-2 to the Appendix is the Declaration of Dr. Ali Saad.  Dr. Saad holds a Ph.D. in Economics
from the University of Chicago, with a specialization in labor economics, and a B.A. degree in history and
economics from the University of Pennsylvania.  He has extensive experience providing statistical and economic
analyses in connection with class action employment discrimination and wage and hour matters.  As discussed in
detail in his declaration, Dr. Saad analyzed, among other things, data from Delta-T's proprietary referral
management system.  The data from this system includes information about the professionals who register with the
company, such as the client ID# associated with each referral opportunity, the category of function required for
adequate fulfillment of the referral, the date(s) of service, the amount of time each referral requires, and the

picture showing highly diverse levels of activity of the contractors, their types of work, their levels of qualifications, and their levels of compensation. (Saad Decl. ¶ 3). First, the data establishes that members of the proposed collective action differ significantly in educational attainment; they include highly educated and skilled professionals holding licenses and certification necessary to meet the needs of the clients to whom they provide services (*e.g.,* a Social Worker with Masters Degree), as well as contractors with fewer qualifications and no special licenses or certifications. (Saad Decl. ¶ 3). Approximately, one-third of the professionals have as their most frequent referral category Residential Aide, while 11% are categorized as Social Workers, 10% as Case Managers, 10% as Therapists or Counselors, 6% as Registered Nurses, and 4% as Teachers. (Saad Decl. ¶ 27).

Variability in the amount of education obtained across different referral categories is pronounced. Of the professionals fulfilling opportunities as licensed Social Workers, 70% hold Maters Degrees. Teachers hold Masters Degrees at a rate of 77%, Case Managers at a rate of 50%, and Registered Nurses at a rate of 28%. For those professionals whose most frequently observed category was coded in the data as Residential Aide, Masters Degrees were held at a rate of 7%. There is a significant spread across referral categories, and across professionals in the level of education held. (Saad Decl. ¶ 28).

The certifications information present in the data also reflects considerable differences in training among the various types of professionals. 92% of the Registered Nurses hold an

---

compensation paid by the client to the professional for providing services relative to the referral. It also includes information about the professionals' education (highest degree attained) and tracks the certifications and licenses that each has received. Dr. Saad reviewed two sub-sets of data regarding the professionals. The first group of data contained the referral histories of 200 professionals, chosen at random from the list of professionals active during the proposed class period. The second group of data contained a historical record over the same period of time for all referrals fulfilled by the opt-ins. (Saad Decl. ¶¶ 1, 2, 8, 9, 10).

CH1 11793705.2

advanced certification.  84% of Social Work professionals have also earned an advanced certificate, as well as 62% of Therapists, 52% of Case Managers, and 44% of Teachers.  These advanced certifications include licenses for clinical social work, nursing, and psychological counseling, as well as FBI clearance and drug/alcohol intervention training.  Advanced certifications are less common among those performing services in some of the other categories shown in the data. (Saad Decl. ¶ 29).

Second, compensation varies widely – both across the various contacting opportunities, and among opportunities that are ostensibly similar.  Educational attainment and certifications held appear related to the referrals that professionals accept and the amount of compensation that they can negotiate for each opportunity.  The average Registered Nurse's hourly rate observed in the data was $30.88 for providing service at a client location.  The average Licensed Social Worker's rate was $30.05 per hour and the average Therapist's or Counselor's rate was $24.05 per hour.  These compensation levels are in contrast to those accepting referrals as Residential Aides, whose rates averaged $11.84 per hour.  Within each category of professional service, there is also a wide range of compensation arrangements.  The data show Therapists' rates as much as $76 per hour and Residential Aides' rates as low as $9.50 per hour. (Saad Decl. ¶ 30).

Third, the duration of these contracting opportunities also varies widely – from a few days or even just a matter of hours, to a number of months.  Among the randomly selected group of professionals, the statistical analysis shows that most professionals provide services to clients on a limited basis.  For the weeks in which any services were provided by the statistically representative professionals, the average number of hours per week spent fulfilling referrals for any client was 25.5.  More than 25% of professionals spend fewer than 14 hours per week providing their services to any clients.  The average professional accepts 3.4 referral

14

opportunities per week.  One in four professionals accepts two or fewer opportunities weekly.  It is very uncommon to find professionals that accept an average of 5 or more weekly opportunities – only 3% had this experience. (Saad Decl. ¶ 12).

The length of time in months over which professionals are observed accepting referrals from Delta-T also tends to be limited.  Among the randomly selected group, the median number of weeks spent seeking and accepting referral opportunities was 24.  Effectively, this means that more than half of Delta-T's professionals rely on Delta-T for referrals for fewer than six months.  69% of the professionals spend less than one year contracting with clients through Delta-T.  One-third of the professionals accepted fewer than 25 total days worth of opportunities during the time they spent as part of the Delta-T registry over the period studied. (Saad Decl. ¶ 14).

Fourth, the number of hours or days per week each professional chooses to or must spend servicing referrals per their contracts also varies widely – from several hours to many hours per week.  During many weeks, professionals accept no opportunities at all.  Since the average number of days worth of accepted referrals per week is low, professionals seldom spend more than 40 hours in any given week providing their services. Among the over 6,000 weeks studied between 2005 and 2009 for the 200 randomly chosen professionals, 84% of them showed professionals providing fewer than 40 hours of service in a given week.  Weeks where the fulfillment of referrals resulted in more than 40 hours are therefore rare.  It is much more common to find weeks where professionals spent fewer than 20 hours on their referrals (41% of the weeks in the data met this criterion).  20% of the weeks showed fewer than 10 hours spent by these professionals on the fulfillment of referrals.  Thus, the data shows that the frequency of weeks with fewer than 10 hours spent servicing referrals was more likely than weeks where total servicing hours was 40 hours or more. (Saad Decl. ¶ 13).

15

Lastly, statistical analysis of the data establishes that the opt-ins are not representative of the overall putative class.  As an initial matter, the opt-ins represent only approximately one-third of one percent (.35%) of the overall putative class, and are, by definition, self-selected.  For this reason alone, the 22 opt-ins are not representative of the alleged nationwide class. (Saad Decl. ¶¶ 31-36).  Moreover, as discussed in detail in Dr. Saad's declaration, the types of services provided, qualifications, levels of referral activity, and rates of compensation of the opt-ins all differ in large ways from the randomly selected, statistically significant representative group of professionals studied. (Saad Decl. ¶¶ 33-36).[11]

## III.   THE APPROPRIATE STANDARD OF REVIEW

In deciding Plaintiff's motion, this Court has a duty: (i) to determine if Plaintiff has met his burden to show that this case is appropriate for conditional certification, and (ii) to satisfy itself that the litigation is manageable as a collective action.  *Saleen v. Waste Management, Inc.*, No. 08-4959, 2009 U.S. Dist. LEXIS 49891, **12-13 (D. Minn. June 15, 2009).  This is because certification imposes significant costs and burdens on the parties and this Court.  *Id.* at *29 (such costs, at a minimum, would include "the expense of sending out notice to the putative collective members, the substantial widening of discovery, and the burden on the courts of administrating the thousands of claims brought . . . nationwide").  Thus, in reality, court-ordered collective action certification and authorization of nationwide notice is not leniently issued.  *Bosley v. Chubb Corp.*, No. 04-4598, 2005 WL 1334565, *3 (E.D. Pa. June 3, 2005) ("automatic preliminary class certification is at odds with the Supreme Court's recommendation to 'ascertain the contours of the action at the outset'").

---

[11] Notwithstanding their lack of representativeness, the opt-ins are themselves highly diverse, along the same dimensions of the 200 professionals studied. (Saad, Decl. ¶ 38).

16

Plaintiff's recitation of the so-called "lenient standard" of review (*see* Pl. Mem., at 17) gives the erroneous impression that – based on the current posture of the case – there is some sort of presumption in favor of conditional certification.  This is not so, as collective action certification is not dependent on the artful pleading of FLSA theories by Plaintiff's counsel.  *See Davis v. Charoen Pokphand (USA), Inc.*, 303 F.Supp. 2d 1272, 1277 (M.D. Ala. 2004) ("A plaintiff's or counsel's belief [about the claims] . . . are insufficient to justify certification of a collective action . . .").

Plaintiff's contention is also inaccurate because this case has not proceeded as a typical collective action.  Plaintiff's counsel sought a delay in bringing their § 216 (b) motion.  (*See* Docket No. 63).  In the interim, significant discovery has transpired, both before and after Plaintiff's filing of his lawsuit (and in connection with the tag-along class action – *Norris-Wilson, et al., v. Delta-T Group, Inc.*, Case No. 09-CV-916 (S.D. Cal.) – filed by Plaintiff's counsel); this discovery was voluntarily initiated and aggressively pursued by Plaintiff's counsel. Further, Plaintiff's counsel has relied upon the fruits of their discovery in support of their motion.  (*See*, *e.g.*, Pl. Mem. 3-14).  Plaintiff's argument for a "hands off" review is at odds with the posture of the case, his discovery campaign, and the evidence cited in his motion.  *See Davis,* 303 F. Supp. 2d at 1276 (finding that "a more searching standard of review [was] appropriate" where plaintiffs "had time to conduct discovery and … filed … evidence in support of their motion."); *Valcho v. Dallas County Hospital District*, 574 F.Supp. 2d 618, 620-21 (N.D. Tex. 2008) (as plaintiff's counsel had three months within which to conduct discovery on issues pertinent to their § 216 (b) motion, the court determined that this was sufficient time within which to develop a record on the issue of whether putative collective action members were similarly situated; the court denied plaintiff's motion on the grounds that the record showed that

conditional certification was improper).  Hence, the evidence in the record is such that this

Court's analysis of the issues raised by Plaintiff's motion must be necessarily more probing than

that argued for by Plaintiff's counsel.  In addition, the record shows conclusively that this lawsuit

is not manageable as a collective action.

Plaintiff's view of this Court's standard of review is also erroneous in several respects.

First, courts must consider all evidence in the record when determining whether or not a case

may be conditionally certified under § 216 (b).  *See, e.g., Holt v. Rite Aid Corp.*, 333 F. Supp. 2d

1265, 1274 (M.D. Ala. 2004) (rejecting plaintiff's argument that the court should ignore

defendant's evidence at the conditional certification stage as "it is appropriate to examine all of

the relevant evidence"); *Aguirre v. SBC Communications, Inc.*, No. 05-3198, 2007 U.S. Dist.

LEXIS 17259, **27-28 (S.D. Tex. March 12, 2007) (noting that "all the depositions, affidavits

and documents are properly considered in deciding whether the first-stage requirements are met.

In considering this evidence, the court does not accept the substance of plaintiff's affidavits or

depositions over that submitted by defendants, but examines the evidence to determine whether it

is appropriate to certify [a class]").  Second, where, as here, a significant class size is at issue

(*i.e.*, Plaintiff's counsel claims the class in this particular litigation numbers over 20,000

individuals), courts do not take this inquiry lightly by virtue of the significant burdens imposed

on all of the parties by the scope of the requested relief.  *See, e.g., Williams v. Accredited Home

Lenders, Inc.*, No. 05-1681, 2006 WL 2085312, *4 & n.4 (N.D. Ga. July 25, 2006) (noting that

similarity requirement must be applied with "rigor" in large cases).  Finally, where Plaintiff's

counsel seeks to send court-approved notice to potential litigants, courts recognize that such

requests must be treated with a higher level of scrutiny.  *See, e.g., Brooks v. AT&T, Inc.*, No. 07-

3054, 2009 U.S. Dist. LEXIS 20552, *18 (N.D. Ga. Feb. 10, 2009) ("we can think of no good

reason for apparent judicial sponsorship of the notice, at a stage in the litigation when there has been no determination that the plaintiff's allegations have any merit, … [as] judicial imprimatur is likely to be misunderstood as a representation that the suit probably has merit …").

**A.**   **Significant Discovery Has Taken Place In This Litigation**

Unlike many cases where a plaintiff's counsel makes an immediate pre-discovery request for conditional certification based on the allegations in the complaint, here the evidentiary record before the Court is fulsome.  Likewise, this case has not proceeded in the two-step process referred to by Plaintiff's counsel in their § 216 (b) motion, and thus does not "fit" the "lenient stage" standard.  Rather, Plaintiff's counsel short-circuited the process by disseminating informal notice of the lawsuit and inviting others to opt-in.  (Maatman Decl. ¶ 6).[12]  The Court previously had occasion to observe this activity.  (*See* Docket Nos. 41, 54).

With regard to discovery, Plaintiff has been securing evidence in this case since February 2009.  For example, the parties have served and responded to multiple rounds of written discovery requests.  (Maatman Decl. ¶¶ 11-16).  Delta-T has produced thousands of pages of documents to Plaintiff.  (Maatman Decl. ¶ 11).  Plaintiff's counsel deposed Delta-T's corporate designee over the course of three separate deposition sessions covering 17 separate topics.  (Maatman Decl. ¶ 17).  Plaintiff's counsel also secured deposition testimony from two other company personnel.  (Maatman Decl. ¶ 20; Comitz Dep. Tr. at 10: 11-18, 126; Kiehbiel Dep. Tr. 2, 12: 23-25, 13: 1-6, 161).  Plaintiff has procured and filed 22 declarations from selected opt-ins.  Plaintiff has testified about his lawsuit over a 6 hour deposition.  (Maatman Decl. ¶ 21).  Two opt-ins, Abigail Papa and Vonda Norris-Wilson, provided two days of deposition testimony

---

[12] Without Court-supervised notice, approximately 64 current or former professionals have filed consent forms to opt-in to this litigation.  (Maatman Decl. ¶ 6).

regarding issues relevant to this case.  (Maatman Decl. ¶ 19).[13]  Plaintiff's counsel has contacted numerous current and former Delta-T employees in an attempt to obtain information for use in conjunction with the pending motion.  (Maatman Decl. ¶ 7); (*See also* Docket Nos. 41, 56). Plaintiff's counsel also has issued Freedom of Information Act ("FOIA") requests to several government entities and obtained a significant amount of documentation regarding Delta-T. (Maatman Decl. ¶ 9).  Lastly, Delta-T has submitted with its opposition brief 83 declarations from professionals currently or formerly engaged with Delta-T.  (Maatman Decl. ¶ 22).

Accordingly, Plaintiff's proposed standard of review does not apply here.  This case has proceeded far past the so-called "first stage."  The Court has ample evidence before it to make an appropriate inquiry into whether Plaintiff has met his burden of establishing that he and the potential collective action members are similarly situated and whether the proposed § 216 (b) action is manageable.

**B.    Conditional Certification Is Not Automatic; Plaintiff Relies On The Wrong Standard For His Motion, As Substantial Discovery Has Occurred, And A Stricter Analysis Applies**

The FLSA permits a plaintiff to maintain an action on "behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216 (b).  Courts are not required – but have the discretion in appropriate FLSA actions – to regulate the notice, if any, sent to similarly-situated potential plaintiffs.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989).

---

[13] Norris-Wilson and Papa, the named plaintiffs in the California matter, convey a troubling sense of disengagement with these matters.  Specifically, Norris-Wilson testified at her deposition that she had never seen the complaint filed on her behalf in the California matter and has no idea why the California case was filed as a class action.  (Norris-Wilson Dep. Tr. at 7: 8-14; 203: 5-25; 204:1).  Likewise, Papa testified that she had not seen the complaint filed in the California matter, has not discussed the case with her named co-plaintiff, and in fact, does not even know who Norris-Wilson is.  (Papa Dep. Tr. at 9: 2-6; 10: 16-20; 11:1-4).  Regarding the declaration filed on her behalf in the Pennsylvania matter, Papa testified that she was not sure that it looked familiar, and when questioned further, admitted that she did not read important segments of her declarations and was unable to explain the discrepancy between the time she said she was engaged with Delta-T in her declaration versus her deposition testimony.  (Papa Dep. Tr. at 125: 9-18; 128:18-25; 127:1-8).

Court-facilitated notice is not mandatory and "it is not automatic." *Rincon v. B.P. Security & Investigations, Inc.*, No. 06-538, 2006 WL 3759872, *2 (S.D. Tex. Dec. 19, 2006). Rather, it should be authorized only if the plaintiff has made a sufficient showing that his or her case is an appropriate case for collective action treatment. *See Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003); *Saleen*, 2009 U.S. Dist. LEXIS 49891, *3 (a court should only grant a § 216 (b) motion when plaintiff shows that his or her case is an "appropriate case" for such relief).

The Third Circuit has not endorsed any particular method or standard for determining "whether potential class members are 'similarly situated' such that FLSA plaintiffs may be entitled to send them notice of the suit." *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 U.S. Dist. LEXIS 21010, *4 (E.D. Pa. Nov. 13, 2003). Courts in this district, however, have rejected the "mere allegation" approach and found that "automatic preliminary class certification is at odds with the Supreme Court's recommendation to 'ascertain the contours of the [§ 216] action at the outset." *Id.* at *9. While Plaintiff's counsel advocates a "two-stage" approach (*see* Pl. Mem., at 16), that standard has been utilized in far different circumstances. The first step is generally conducted early in the litigation process, immediately after the lawsuit's filing, and consists of a preliminary inquiry into whether the Plaintiff's proposed class consists of similarly situated employees. Here, however, the record and procedural process is clearly far beyond that point. Hence, a different standard applies. *See, e.g., Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 496-97 (D.N.J. 2000) (because potential plaintiffs already had opted-in to the case and discovery had transpired, the court held that a higher standard applied).

Significant case law supports the notion that a higher burden applies in this instance. *See, e.g., Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007)

21

("[d]istrict courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification"); *Morisky*, 111 F. Supp. 2d at 496-97.  Courts apply an intermediate standard in determining "whether conditional certification of a collective action is appropriate by evaluating all the facts that have thus far been placed before it."  *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 895 (N.D. Iowa 2008) (court utilized an analysis to account for all the important facts learned through discovery); *Williams*, 2006 U.S. Dist. LEXIS 50653, **11-12, 16 (where plaintiff's counsel "short-circuited" the notice process "by disseminating informal notice of the lawsuit," others opted-in, and the parties engaged in discovery, the court denied plaintiffs' § 216 (b) motion and rejected their request to postpone this ruling until later; the court concluded that the "waste of scarce judicial resources … would be unconscionable" where plaintiffs' "proposed collective action does not permit the efficient resolution" of the issues at hand).

In similar circumstances, courts have determined that "[t]aking the intermediate two-step approach permits the Court to determine whether a sound basis exists for proceeding conditionally as a collective action while also considering all evidence available at this time." *Bunyan v. Spectrum Brands, Inc.*, No, 07-89, 2008 U.S. Dist. LEXIS 59278, *14 (S.D. Ill. July 31, 2008) (court denied conditional certification because the dissimilarities between potential plaintiffs' employment duties and responsibilities would require individualized inquiries making the litigation unmanageable and inefficient as a collective action).  Thus, "[w]hen sufficient evidence in the record makes it clear that notice is not appropriate a court can collapse the two stages of the analysis and deny certification outright."  *See, e.g., Purdham v. Fairfax County Pub. Schs.*, No. 09-50, 2009 U.S. Dist. LEXIS 52781, *11 (E.D. Va. June 22, 2009) ("the Court

22

finds that conditional certification is inappropriate because of the probable necessity of an individualized FLSA coverage determination for each member of the potential class").

The record before the Court is extensive as to the key issues pertinent to Plaintiff's motion. This case has progressed far past the initial stage such that sufficient evidence exists in the record for the Court to utilize the intermediate approach. Indeed, no additional discovery will alter the fact that Plaintiff cannot meet his burden, or the conclusion that this case is not manageable as a collective action.[14]

## IV.      LEGAL ARGUMENT

### A.      Plaintiff's Motion Is Defective On Its Face

This Court should deny Plaintiff's motion because his class definition is defective as a matter of law. Rather than define the class in terms of a particular job title or a recognized group of employees who are similarly situated, Plaintiff's counsel has opted to define the class in terms of a legal title, *i.e.*, all persons who are actually employees for FLSA purposes but who are allegedly misclassified as independent contractors. By definition, no person can be a member of the class unless they are an employee for FLSA purposes as opposed to an independent contractor. Because the class is defined in terms of this highly disputed issue of fact and law, the class definition fails on its face. *See, e.g., Mike v. Safeco Ins. of America*, 223 F.R.D. 50, 54 (D. Conn. 2004) ("where a threshold inquiry is necessary to determine class membership, the benefits to proceeding as a class action are eviscerated [and] class certification is not beneficial"). Likewise, where a class definition requires a court to conduct mini-hearings on the

---

[14] Delta-T submits that no matter which standard this Court decides to apply, Plaintiff has failed to satisfy his burden. *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 (M.D. Ala. 2002) ("A plaintiff bears the burden of establishing that he and the class he wishes to represent are similarly situated."); *Morisky*, 111 F. Supp. 2d at 496 ("Plaintiffs bear the burden" to satisfy the similarly situated standard).

economic realities underlying each proposed class members' circumstances, collective action certification is not proper because of the difficulties in defining membership in the class. *See Coleiro v. Spartan Stores, Inc.*, No. 02-150, 2004 WL 3951586, *2 (W.D. Mich. Aug. 16, 2004) (denying motion for conditional certification where the plaintiff failed to adequately define the proposed class; each opt-in would require "piecemeal litigation" to determine whether [they were] actually a member of the class, which "would add not only confusion to this case, but require significant litigation and certainly would not aid in the efficient administration of justice"); *Mueller v. CBS, Inc.*, 200 F.R.D. 227, 233 (W.D. Pa. 2001).

In this instance, Plaintiff's class definition is dependent upon this Court's future determination of the merits. For this reason, the class definition is defective. *See, e.g., In Re Wal-Mart Wage and Hour Empl. Prac. Litigation*, No. 06-225, 2008 U.S. Dist. LEXIS 50928, *66 (D. Nev. June 20, 2008) ("[N]o one would be able to determine who was a class member until it had been determined through individualized inquiry that in fact Wal-Mart had failed to compensate a particular employee"). Where, as here, the propriety of issuing notice to putative collective action members depends on the resolution of "many predicate factual issues," the class definition is "defective" and notice should not be authorized as it is "a virtual impossibility under these circumstances since [the class members] cannot be identified." *Nudell v. Burlington & Santa Fe Rwy. Co.*, No. 01-41, 2002 WL 1543725, **2-3 (D.N.D. July 11, 2002). This defect alone in Plaintiff's case theory renders collective action treatment improper.

### B.   Plaintiff Cannot Establish That The Behavioral Healthcare Professionals In The Proposed Nationwide Collective Action Are Similarly Situated

Contrary to Plaintiff's theory of the case, the mere fact that Delta-T classifies all members of the putative collective action as independent contractors does not support a determination that they are all "similarly situated." In fact, courts around the country

24

consistently have rejected Plaintiff's argument, recognizing instead that such cases involve fact-intensive, highly individualized inquiries.

### 1. Plaintiff Fails To Posit A Viable Claim Based On An Alleged Illegal Policy

Delta-T's policy of classifying behavioral healthcare professionals as independent contractors does not constitute a facial violation of the FLSA. In addition, Delta-T formulated its business model with the assistance of counsel.

For purposes of showing the appropriateness of collection action certification, an FLSA violation would occur only in those instances in which the economic realities of the individual's situation establish that he or she is an employee for FLSA purposes and his or her employer failed to pay overtime. Accordingly, Plaintiff completely misses the mark when he relies exclusively on the existence of the Delta-T "policy" as the basis for his assertion that all members of the proposed collective action are "similarly situated."

Courts routinely require that plaintiffs identify a single, common unlawful policy and not a facially lawful policy or plan that might be illegal if applied in a certain way. *See, e.g., West v. Border Foods, Inc.*, No. 05-2525, 2006 U.S. Dist. LEXIS 96963, *19 (D. Minn. June 12, 2006); *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 536 (N.D. Cal. 2007) (stating that plaintiffs must "make substantial allegations that the putative class members were subject to *a single illegal policy, plan, or decision*") (emphasis added). Case law in the Third Circuit is squarely on point as to this issue. *Morisky,* 111 F. Supp. 2d at 498 (the court denied conditional certification because plaintiff's alleged common scheme involved nothing more than defendant's decision to classify plaintiffs as exempt). Courts outside of the Third Circuit likewise follow this case law authority. *See, e.g., Trinh v. J.P. Morgan Chase & Co.*, No. 07-1666, 2008 WL 1860161, *4 n.2 (S.D. Cal. Apr. 22, 2008) ("Because Plaintiffs' only allegation that Defendants engaged in a

wrongful policy is that Defendants uniformly classified Plaintiffs … as 'exempt,' the Court

follows *Morisky* and other courts in finding that Plaintiffs have failed to make substantial

allegations identifying an *unlawful* nationwide policy) (emphasis added); *Mike*, 274 F. Supp. 2d

at 221 (rejecting plaintiff's argument that defendant's characterization of employees as exempt

under the FLSA sufficiently establishes that these employees are similarly situated for purposes

of conditional certification).

### 2.   Determination Of Independent Contractor Status Cannot Be Adjudicated In A Collective Manner

The determination of independent contractor status under the FLSA necessitates highly

individualized inquiries that are not capable of collective treatment.  Plaintiff concedes that the

question of whether an individual is an independent contractor or an employee necessitates a

fact-intensive analysis, and that, therefore, these disputed issues cannot be tried as common facts

in a collective action setting.  (*See* Pl. Mem., at 15).

A person's classification under the economic realities test cannot be derived from the

Services Agreement or from one isolated factor, but instead is dependent on all of "the

circumstances as a whole."  *Walker v. Washbasket Wash. & Dry*, No. 99-4878, 2001 U.S. Dist.

LEXIS 9309, **23-24 (E.D. Pa. July 5, 2001).  For this reason, courts frequently deny § 216 (b)

motions in cases that involve a purported misclassification of independent contractors.  *See, e.g.,*

*Walker v. Bankers Life & Casualty Co.*, No. 06-6906, 2008 U.S. Dist. LEXIS 60593, *27 (N.D.

Ill. July 28, 2008) (the court declined to certify a class of persons who claimed that they had been

misclassified as independent contractors because the resolution of the misclassification issue

would require an "onerous inquiry" into each putative class member's relationship with the

defendant company); *Pfaahler v. Consultants for Architects, Inc.*, No. 99-6700, 2000 U.S. Dist.

LEXIS 1772, *4 (N.D. Ill. Feb. 8, 2000) ("[I]n order to determine who is an independent

contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship" with the employer); *In Re FedEx Ground Package System, Inc. Empl. Prac. Litigation*, No. 05-527 (MDL-1700), 2009 WL 2242231, *8 (N.D. Ind. Jul. 29, 2009) (the court denied plaintiffs' § 216 (b) motion because the court would have to apply the economic realities test, which would require it to "focus on the economic reality of the nature of the working relationship, requiring consideration of all the circumstances of the work activity, not just one isolated factor"). *See also In Re Wells Fargo Mortgage*, 571 F.3d 953, 958 (9th Cir. 2009) (judicial economy is not served by certification order based on an employer's treatment of all employees "as exempt from federal overtime requirements;" this approach "disregards the existence of other potential individual issues" that are "not susceptible to common proof . . ."); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) (same).[15]

In *Pfaahler*, the defendant was a referral company that placed architects and design professionals with corporate clients on a contractual basis. *Id.* at *1. Putative plaintiffs had to register with defendant, and defendant found them engagements with local businesses. *Id.* Plaintiff was a designer who registered with defendant and was referred an opportunity with a local firm. *Id.* at *2. Plaintiff alleged that even though he provided services to the local firm, he was defendant's employee. *Id.* Plaintiff alleged that he was paid on an hourly basis by defendant and was entitled to overtime pay from defendant. *Id.* Plaintiff contended that he was

---

[15]   *Vinole* and *In Re Wells Fargo Mortgage* interpreted the predominance requirement of Rule 23 in denying certification. The predominance requirement of Rule 23 is essentially the same as the analysis of the "similarly situated" requirement under the FLSA. *Mike*, 223 F.R.D. at 53 ("The same reasons that preclude [plaintiff] from proceeding as a collective action under the FLSA preclude him from defining a tenable class under Rule 23."); *Diaz v. Electronics Boutique of America*, No. 04-840, 2005 WL 2654270, *6 (W.D.N.Y. Oct. 17, 2005) ("For the same reasons that plaintiffs cannot meet the [FLSA's] similarly situated requirement … plaintiffs fail to meet the commonality requirement of Rule 23(a).").

27

similarly situated with other potential class members because they were all improperly classified as independent contractors and denied overtime wages. *Id.* at *4. In denying conditional certification, the court reasoned that:

> [i]n order to determine who is an independent contractor and who is an employee, the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with [defendant]; this inquiry could also entail examining each claimant's relationship with the various corporate clients with whom they were placed by [defendant]."

*Id.*

More recently, in an FLSA case involving truck drivers for FedEx who it classified as independent contractors, plaintiff argued that putative collective action members "were sufficiently similar to the named plaintiff because they were categorically misclassified as independent contractors and all subject to the same Operating Agreement." *In Re FedEx Ground Package System, Inc. Empl. Prac. Litigation*, 2009 WL 2242231, *6. The court determined that it would have to apply the economic realities test, which would require it to "focus on the economic reality of the nature of the working relationship, requiring consideration of all the circumstances of the work activity, not just one isolated factor." *Id.* at *8. Specifically, the court reasoned that:

> [it] must take into consideration the actual history of the parties' relationship, necessitating an individualized examination of the multiple factors relating to each drivers' employment. Because the evidence pertaining to such factors varies in material respects throughout the proposed class there is a lack of substantial similarity among the putative class members sufficient to justify treatment as a collective action.

*Id.* Given these facts, the court denied plaintiff's motion for conditional certification under § 216 (b).

The present case is on all fours with *Pfaahler* and *FedEx Ground*. In those cases, like the situation presented here, plaintiffs argued that putative collective action members were

categorically misclassified as independent contractors because they were all subject to the same (or similar) independent contractor agreement or policy.  Just as the courts determined in *Pfaahler* and *FedEx Ground*, however, this Court would have to focus on the economic realities of the working relationship and consider all the circumstances of the work activity, not just one isolated factor, to determine whether Plaintiff and the putative collective action members are similarly situated.  As these individual questions eclipse any common ones, collective action treatment of Plaintiff's claim is improper.

The independent contractor declarations submitted by Delta-T provide extensive examples of how diverse the work activity is for professionals who accept referrals from Delta-T.  Plaintiff's contrary assertion of commonality is likewise contradicted by the deposition testimony of Plaintiff and several opt-ins, as well as the declarations of opt-ins submitted by Plaintiff's counsel.  Further compounding these differences are the thousands of ways in which each professional interacts in these settings with their clients.  In evaluating whether the independent contractors are "similarly situated" under the FLSA standard for collective actions, this Court will be required to make highly individualized determinations that are not capable of collective determination.  *See King v. West Corp.*, No. 04-318, 2006 U.S. Dist. LEXIS 3926, *45 (D. Neb. Jan. 13, 2006) (in denying plaintiff's § 216 (b) motion, the court reasoned that the differences among the putative collective action members with respect to "client interactions" would "overwhelmingly predominate" and "require individual inquiry at trial.").

For example, this Court would need to examine such factors in applying the economic realities test, which requires analysis of numerous relevant factors including the following:

1.      the professional's degree of control over work performed;

2.      the professional's opportunity for profit or loss;

3.      the professional's investment in equipment and materials;

29

4.      whether a special skill is required to perform the professional's function;

5.      the permanency of the working relationship; and,

6.      whether the service rendered by the professional is integral to the putative employer's business.

*Walker*, 2001 U.S. Dist. LEXIS 9309, **23-24.  Each of these factors is evaluated in light of the actual history of the parties' relationship, and all the circumstances of the work activity.  *See Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) ("In deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work [and] drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors.").  In the Third Circuit this analysis depends on "circumstances of the whole activity," *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991), thereby making it impossible to adjudicate these disputed issues in a collective action setting.  As discussed below, evaluation of the "economic reality" factors would necessitate innumerable individualized inquiries.

> **(i)      Evaluation Of The Degree Of Control Requires An Individualized Inquiry As To The Work Actually Performed**

Courts typically focus on the work a person actually performed when determining the degree of control under the economic realities test.  *Stone v. Pinkerton Farms, Inc.*, 741 F. 941, 942 (7th Cir. 1984).  Plaintiff asserts in his complaint that Delta-T controlled the manner in which he performed his professional services.  Plaintiff also submits declarations from 22 individuals that state, in a cookie-cutter fashion, that "Delta-T directly controlled and supervised many aspects of my work."  (*See, e.g.*, Docket No. 101, Exs. 3A, 3B).

Plaintiff's generic assertion, however, is contradicted by the specific factual representations set forth in the declarations submitted in conjunction with Delta-T's opposition to

the pending motion.  The vast majority of these individuals clearly state that Delta-T did not control their activities.  (*See generally* Ex. G - Index  §§ A, B 1-6, 13, 14).  Many individuals explained that they have received high levels of education and training in their respective fields necessary to perform their professional duties.  (Ex. G - Index § B 17).  The professionals also acknowledge that Delta-T personnel do not have the same level, or any, training in the applicable professional fields, and thus are not capable of directing or controlling the manner or means in which the professionals provide their services to clients.  (Ex. G - Index § B 1, 2).  Likewise, many professionals testified that they were free to accept or reject referrals and that Delta-T did not place them in jobs.  Further, the professionals are free to control their own work schedule, negotiate their own rates, and provide services as the professional deems fit.  (Ex. G - Index §§ B 13, 14).  To the extent Plaintiff claims to the contrary, it shows the key issues are not resolvable on a collective action basis.  Each of these facts significantly undercut Plaintiff's bald assertion that Delta-T controls the healthcare professionals who register with the company.  In sum, the fact that each individual presents a different set of circumstances highlights why the Court cannot make a determination regarding the "control" factor, or any other "economic reality" factor, on a collective basis.

> **(ii)      Evaluation Of Opportunity For Profit Requires An Individualized Inquiry**

Plaintiff offers no explanation as to how the "opportunity to profit" can be evaluated on a collective basis.  The professionals' opportunity to profit varies based on a number of individualized factors, including ability to negotiate higher rates.  (*See, e.g.*, Ex. G - Index §§ B 14, 16).  Professionals also have the opportunity to take on multiple referrals simultaneously to increase their profit.  (*See, e.g.*, Ex. G - Index § B 22).  In fact, the professionals who operate their own businesses or private practices are often able to expand their client base through Delta-

T referrals, which increases their profit.  (*See, e.g.*, Ex. G - Index §§ B 8, 10).  Likewise, profit

opportunities vary depending on the frequency of referrals, the existence of consumers needing

behavioral healthcare services in the professional's area of expertise, and the professional's

decision to hire others to perform services for other referrals the professional procures.  (*See*,

*e.g.*, Ex. G – Index §§ B 3, 8, 9-14, 16-22).

### (iii)    Evaluation Of Investment In Equipment And Materials Requires An Individualized Inquiry

Behavioral healthcare professionals provide specialized services to clients.  (*See, e.g.*,

Ex. G - Index § A).  The value of those services is based in part on the professional's training

and education, which are the tools of their trade.  As illustrated by the declarations, many of

these professionals invest significant time and money into their education and training, which

makes them more attractive to potential clients as behavioral healthcare professionals and can

lead to increased referrals.  (*See, e.g.*, Ex. G - Index §§ A, B 17, 18).  The evaluation of any

given professional's investment is an individualized inquiry and cannot be done on a collective

basis.

### (iv)    Special Skill Required To Perform A Particular Function Cannot Be Determined On A Collective Basis

Plaintiff does not address how the Court could possibly determine on a collective basis

the level of skill required for each member of the proposed collective action to perform their

wide ranging functions.  Delta-T's declarations illustrate that the behavioral healthcare field has

different segments with varying skill requirements ranging from CPR certification, to post-

graduate training, to supervised clinical experience.  (*See, e.g.*, Ex. G - Index § A).  Each referral

opportunity has its own certification and licensing requirements.  (*See, e.g.*, Ex. G - Index § A).

The type of behavioral healthcare services vary so significantly that a collective examination of

thousands of professionals is, if not impossible, certainly impractical.

(v)     The Length Of A Professional's Assignment/Permanency Of
        The Working Relationship Cannot Be Determined On A
        Collective Basis

Plaintiff again ignores this factor.  The record shows that there are wide variations in the experiences of the putative collective action members.  Because of the variances with regard to this component of the "economic reality" test, there is no way to evaluate this factor without separately scrutinizing each professional's unique set of facts and circumstances.  (Saad Decl. ¶¶ 12-22).  To illustrate, the variances in length of relationship and contracts of Plaintiff (as well as the two California opt-ins Norris-Wilson and Papa) in this matter demonstrate that there is no similarity in these factors.  For example, Plaintiff first contracted in 2000 and ceased accepting referrals in 2007 (Pl. Dep. Tr. at 119-120), while Norris-Wilson engaged Delta-T services for a much shorter time period from 2005 to 2007 (Norris-Wilson Dep. Tr. at 52, 177) and Papa had even a shorter relationship from 2007 to 2008 (Papa Dep. Tr. at 27, 168).  In addition, the length of the contracts varied significantly, in that Plaintiff's longest contract was a duration of 620 days while Norris-Wilson's was 116 and Papa's was only 75 days. Likewise, Plaintiff admitted that with respect to "[i]ntermittent referrals from Delta-T, some last a shift others last longer, depends on clients needs." (Pl. Dep. Tr. at 96, 97).  Suffice it to say, this issue cannot be resolved on a collective basis.

3.     The Myriad Declarations Submitted To The Court By The Parties
       Highlight That Potential Collective Action Members Are Not
       Similarly Situated

Lest there be any remaining doubt regarding the individualized nature of each professional's experience, Delta-T respectfully suggests that the Court compare and contrast Plaintiff's situation with the factual scenarios set forth in the declarations submitted to this Court in Exhibit G to the Appendix.  Such a review will show that each professional's situation is markedly different.

33

**(i)    There Are Significant Differences Between Plaintiff And The Opt-Ins**

Plaintiff has an engineering degree from his home country, Nigeria.  (Pl. Dep. Tr. at 37).  He worked as a structural engineer in Lagos before coming to the United States in 1996 with his country's para-Olympics team.  (Pl. Dep. Tr. at 31).  Plaintiff became a U.S. citizen in 2003.  (Pl. Dep. Tr. at 32).

In 1999 Plaintiff registered with Delta-T Group, Inc. in Bryn Mawr, Pennsylvania.  He signed a copy of the Delta-T Services Agreement in which he acknowledged his independent contractor status.  (Pl. Dep. Tr. at 59).  Plaintiff accepted referrals from Delta-T between 2000 and 2007.  (Pl. Dep. Tr. at 119-120).  In doing so he provided services at different facilities, either as a "Residential Counselor" or "Case Manager."  As a Residential Counselor, Plaintiff's duties included taking clients out for activities and programs, cleaning the house, cooking, changing diapers, and other miscellaneous services.  (Pl. Decl. ¶ 5).  As a Case Manager Plaintiff "coordinated treatment for individuals with developmental disabilities and maintained case files for these individuals."  (Pl. Decl. ¶ 5).

Plaintiff claims to have worked an average of 50 to 60 hours per week at various facilities for which he accepted referrals.  Plaintiff also claims to have worked a completely separate, full-time job from 2002 to 2007 and a part-time job from 2006 to 2007.  He also purportedly attended school at night during the period he was accepting referrals from Delta-T.  (Pl. Dep. Tr. at 207).[16]

In comparison to the named Plaintiff's situation, only 4 of the 22 opt-ins who submitted declarations held titles of "Residential Counselor."  (See Pl. Exs. 3(b); 3(m); 3(v); 3(w).)  Only one other opt-in held the title of "Case Manager."  (See Pl. Ex. 3(j).)  The rest of the opt-ins who

---

[16] Plaintiff claims that he was able to do all of this because he does not sleep.  (Pl. Dep. Tr. at 209).

CH1 11793705.2

submitted declarations had vastly different titles, including direct care worker, mental health associate/worker, counselor, mentor, residential aide, behavioral assistant, clinical social worker, case manager, professional contractor, personal care assistant, job coach, drug & alcohol counselor, and substitute teacher.  (See Pl. Exs. 3(c), (d), (e), (g), (h), (i), (j), (k), (l), (n), (p), (q), (r), (s), and (t).)  Each of these titles carried different duties and responsibilities.  (Saad Decl. ¶¶ 26-30).  Importantly, the 22 declarations submitted by Plaintiff also confirm that the individuals worked different numbers of hours (ranging from 25 to 60 hours per week)[17] and were paid different rates (ranging from $10 per hour to $45 per hour).[18]

Expanding the analysis to the entire population of opt-ins shows even greater differences among the group.  For example, as a group the opt-ins have held more than 30 different positions at approximately 250 different Delta-T clients and have entered into approximately 1,400 separate engagements with Delta-T clients.  (S. McAndrews Decl. ¶ 18).  Complicating matters even further, approximately one-third of the opt-ins will be subject to statute of limitations or other dispositive defenses.  For example, Delta-T's records indicate that eleven opt-ins filed their notices of consent more than three years after they last provided services as a Delta-T contractor. (S. McAndrews Decl. ¶ 19).  Accordingly, their claims would be barred.  Similarly, six of the opt-ins never provided more than 40 hours of service in any given week, and thus, have no claim. (S. McAndrews Decl. ¶ 20).  Even more remarkable, records indicate that three of the opt-ins never provided any services through Delta-T and therefore, clearly lack standing to join in this case.  (S. McAndrews Decl. ¶ 21).  These facts, in and of themselves, demonstrate that a

---

[17] (See Pl. Exs. 3(d); 3(e); 3(o); 3(s)).

[18] (See Pl. Ex. 3(c); 3(j)).

collective action is improper.  *Williams*, 2006 U.S. Dist. LEXIS 50653, *15 (in denying

plaintiff's § 216 (b) motion for conditional certification, the court noted that given the extensive

declarations presented by defendant, "the best that can be said of the plaintiffs' case is that some

[individuals] were paid overtime and some were not.  If this case goes forward as a collective

action, an individualized inquiry into why some were not paid overtime is required.").

 Delta also is aware of facts that may provide the basis for additional defenses, and

possibly counterclaims, against certain opt-ins.  For example, Delta-T has reason to believe that

some of the opt-ins may have submitted fraudulent billing statements to Delta-T.  (S.

McAndrews Decl. ¶ 22).  These opt-ins include, but may not be limited to, Rachel Dupree, Ruth

Dupree, John Forman, Valerie Smith, Kym Westry, Abdallah Elnur Mohamed, Jacquelynne

Goode, Mamie Gilliam, and Rietta Ferrer.  (S. McAndrews Decl. ¶ 22).  For example, Delta-T's

investigation has uncovered invoices submitted by Jacquelynne Goode to Delta-T, which

indicate that Ms. Goode sought compensation for services allegedly provided on February 29,

2008 at one location from 10:00 a.m. to 10:00 p.m. and at another location miles away from 8:00

a.m. to 12:00 p.m. and 12:15 p.m. to 7:15 p.m.  (S. McAndrews Decl. ¶ 22).  It is impossible that

she was in two locations at the same time providing services.  (S. McAndrews Decl. ¶ 22).

Delta-T's investigation suggest that other opt-ins have similar questionable billing practices.  (S.

McAndrews Decl. ¶ 22).  Such issues obviously could not be dealt with in a collective manner;

therefore, such issues preclude collective action certification.  *See, e.g., Sepulveda v. Wal-Mart

Stores, Inc.*, 237 F.R.D. 229 (C.D. Cal. 2006) (individualized defenses cannot be handled on a

class-wide basis), *rev'd on other grounds*, 275 Fed.Appx. 672 (9th Cir. 2008); *Hinojos v. The

Home Depot, Inc.*, No. 06-108, 2006 WL 3712944, **2-3 (D. Nev. Dec. 1, 2006) (discussing the

"importance of cross-examination" of each putative class member of the collective action, and

denying plaintiffs' § 216 (b) motion due to the "significant individual determinations and considerations" underlying their case theory).

In short, the facts and issues referenced above highlight that there are significant differences among the relatively small population of opt-ins, let alone the entire universe of behavioral healthcare professionals in the proposed collective action.

>           **(ii)     Declarations Submitted By Delta-T Show Significant**
>           **         Differences Among The Potential Collective Action Members**

The declarations submitted by Delta-T establish even further differences between the potential members of the proposed collective action. (*See generally,* Ex. G - Index attached as Exhibits A and B, and corresponding declarations attached as Exhibits G-2 to G-84). The declarations highlight that Plaintiff's experience represents an infinitesimally small segment of the professionals engaged with Delta-T. A small sampling of the declarations is set forth below.

- Lloyd Rudley – Medical degree in psychiatry. (Rudley Decl. ¶ 1). Has maintained his own general psychiatry practice. (Rudley Decl. ¶ 2). Accepted Delta-T referrals to service patients who had psychiatric and substance abuse problems in different settings including hospitals, outpatient programs, and community clinics. (Rudley Decl. ¶¶ 7-10).

- David Alexander **-** M.A. in Counseling. (Alexander Decl. ¶ 1). Licensed Clinical Professional Counselor which allows him to provide psychotherapy to patients who have anger management issues, trauma problems, mood disorders, and personality disorders. (Alexander Decl. ¶ 2). Operates his own private practice. (Alexander Decl. ¶ 4). Accepted numerous referrals in different facilities providing group therapy, psychotherapy, and counseling in outpatient and in-house facilities. (Alexander Decl. ¶¶ 9-11).

- George Hayes - M.A. in Social Work. (Hayes Decl. ¶ 1). Full-time social worker for middle school and accepts referrals from Delta-T to supplement his income. (Hayes Decl. ¶¶ 1, 2). Accepted referrals for mentoring children and teenagers with behavioral problems in home and dormitory settings. (Hayes Decl. ¶¶ 3, 4).

- Sarah Pilgrim - M.A. in Social Work and working towards Ph.D. (Pilgrim Decl. ¶ 1). Accepted referrals to provide case manager services at mental health facility and institute for palliative medicine assisting with institutional documentation regarding hospice patients. (Pilgrim Decl. ¶ 4, 5). Also accepted referral at psychological group home as

lead social worker for adolescents who suffered physical and sexual abuse.  (Pilgrim Decl. ¶ 6).

•    Eric Frank - M.A. in Social Work.  (Frank Decl. ¶ 1).  Significant post-graduate training.  (Frank Decl. ¶ 1).  Licensed Clinical Social Worker, which requires thousands of hours of clinical study.  (Frank Decl. ¶ 2).  Partner in general private practice involving family therapy.  (Frank Decl. ¶ 3).  Accepted referrals from Delta-T to supplement income.  (Frank Decl. ¶ 5).  Provided independent contractor services as clinical supervisor at agency providing outpatient services for drug and alcohol abuse and group therapy at correctional facility.  (Frank Decl. ¶¶ 7, 8).

•    Deborah Hartz - M.A. in Nursing.  (Hartz Decl. ¶ 1).  Registered Nurse in four states.  (Hartz Decl. ¶ 1).  Accepted referral to provide outpatient services and support for children and adults with developmental disabilities and assisted with dispensing medication.  (Hartz Decl. ¶ 4).  Accepted referral to perform review of health insurance claims reviewing requests for medical treatment to determine if appropriate.  (Hartz Decl. ¶ 5).

•    Kathleen Cunningham - M.A. in Biblical Theology.  (Cunningham Decl. ¶ 2).  Certified Nursing Assistant.  (Cunningham Decl. ¶ 2).  Registered with other referral service as independent contractor.  (Cunningham Decl. ¶ 4).  Accepted referrals in a number of settings servicing high functioning consumers who require little personal care and low-functioning consumers who require total care.  (Cunningham Decl. ¶ 5).  Provided independent contractor services in hospital lock-down unit responsible for suicide watch and worked one-on one with adult women in a home setting supervising dispensation of medication and other daily activities.  (Cunningham Decl. ¶¶ 6, 8).

•    Lisa McNeil - Licensed Practical Nurse (LPN) and owner and operator of McNeil Healthcare, Inc.  (McNeil Decl. ¶ 1).  Company provides training for clients in CPR separate from Delta-T.  (McNeil Decl. ¶ 3).  Accepted referrals to provide services to adolescent suffering blindness and who is developmentally disabled such as administering medication, assisting with physical therapy, and other aspects of daily care.  (McNeil Decl. ¶ 5a).  Also accepted referral to serve as school nurse in specialized school for developmentally disabled children.  (McNeil Decl. ¶ 5).

•    Donaflyn Crawford - Associate's degree in Network Information Systems.  (Crawford Decl. ¶ 10).  Accepted referral from Delta-T to provide one-on-one academic support for autistic child in elementary school.  (Crawford Decl. ¶ 2).  Referral spanned the entire school year.  (Crawford Decl. ¶ 2).  In additional to referrals from Delta-T, offers private music instruction and math tutoring.  (Crawford Decl. ¶ 8).

•    Beth Haubrock - B.S. in Elementary and Special Education.  (Haubrock Decl. ¶ 1).  Accepted a number of referrals through Delta-T, but also received independent contractor referral from other companies.  (Haubrock Decl. ¶ 3).  Accepted a number of one-day referrals at different elementary schools as a para-professional assisting students with classroom assignments and social skills to catch up with their peers.  (Haubrock Decl. ¶¶ 7, 9-11).

CH1 11793705.2

- Anthony Jeffery - GED. (Jeffery Decl. ¶ 1). Operates a not-for-profit ministry, but enjoys flexibility of independent contractor status. (Jeffery Decl. ¶¶ 1, 4). Accepted different referrals in school setting as para-professional to provide one-on-one support for elementary school child with autism, to monitor high school student suffering from mild retardation and sporadic epileptic seizures. (Jeffery Decl. ¶¶ 5, 6).

- Christina Gilbert - M.A. in Clinical Psychology. (Gilbert Decl. ¶ 2). Registered with Delta-T to supplement income. (Gilbert Decl. ¶ 3). Accepted referrals as para-educator and provided services at dormitory facility for children released from detention centers. Supervised children on field trips and enforced rules at dormitory.

- Mary Sirleaf-Smith - M.A. in Social Work. Behavioral Specialist Consultant. (Sirleaf-Smith Decl. ¶ 1). Accepted referral to provide services at mental health facility helping children with behavioral modification issues and develop treatment plans. (Sirleaf-Smith Decl. ¶ 6). Works directly with the child and family in facility and home setting. Coordinates schedule directly with child's parents. (Sirleaf-Smith Decl. ¶ 6).

- Timothy Grant - Associate's degree in Business Administration. Residential Aide and Behavioral Health Specialist. (Grant Decl. ¶¶ 3, 4). Accepted a number of referrals in different settings for different consumers including adolescent with autism, adults suffering mental retardation and other mental health issues. (Grant Decl. ¶ 4). Duties and responsibilities vary but include helping adolescents with school work, teaching self-control, and assisting adults with daily activities. (Grant Decl. ¶ 4).

- James Coston - M.A. in Community Counseling Psychology. (Coston Decl. ¶ 6). Owns and operates behavioral counseling and life-coaching company. Registered with Delta-T to supplement income. (Coston Decl. ¶¶ 1, 5). Accepted referrals as a Behavioral Specialist Consultant serving consumers with a variety of mental health disorders. (Coston Decl. ¶ 7). Works with consumer and family to develop and implement treatment plan. (Coston Decl. ¶ 7).

- Marcia Lane - Ph.D. in Marriage and Family Therapy. (Lane Decl. ¶ 1). Licensed Marriage and Family Therapist. (Lane Decl. ¶ 1). Retired from government employment and opened private practice. (Lane Decl. ¶¶ 7, 8). Accepted referrals to provide one-day or two-day commitments providing therapy services to returning military service members. (Lane Decl. ¶ 11).Compensated at flat rate $300 per day regardless of hours worked. (Lane Decl. ¶ 13).

The referenced declarations are a small sampling of the behavioral healthcare

professionals who have submitted declarations in this case. Nevertheless, these declarations

highlight that no two individuals are alike in terms of the economic realities analysis. Given the

individualized nature of each professional's situation and experience, it would be impractical, if

not impossible, to have this case proceed as a collective action.  *See Williams*, 2006 U.S. Dist.

LEXIS 50653, *15.  Such individualized inquiries are the antithesis of a proper collective action.

### C.    This Court Should Deny Plaintiff's Motion For The Additional Reason That He Is An Inadequate Representative

Although the requirements of Rule 23 are generally inapplicable to collective actions

brought under the FLSA, adequacy of representation is still a relevant consideration for this

Court in determining whether to grant Plaintiff's motion under § 216 (b).  *See*, *e.g.*, *White*, 204 F.

Supp. 2d at 1315 ("FLSA collective actions are representative actions, and, given that individuals

who 'opt-in' to this proceeding will most likely be represented by the named-plaintiff's counsel,

the court has an equitable interest in ensuring that they are adequately represented.") (quoting

*Hoffman v. Sbarro, Inc.* 982 F. Supp. 249, 263 (S.D.N.Y. 1997)); *Brown v. Money Tree*

*Mortgage, Inc.*, 222 F.R.D. 676, 682 (D. Kan. 2004) ("Although FLSA §16(b) does not

expressly incorporate Rule 23(a)(4)'s adequacy of representation requirement, the adequacy of

… a class representative is not necessarily irrelevant in a putative FLSA § 16(b) collective action

because the court has an inherent interest in ensuring that opt-in plaintiffs are adequately

represented.").  In this case, Plaintiff is not an adequate representative for multiple reasons.

First, as conclusively demonstrated by the record of evidence before this Court,

Plaintiff's circumstances are so different from the myriad of other professionals in the proposed

putative nationwide collective action that he cannot adequately represent the class as a matter of

law.  His testimony cannot establish facts necessary for presentation of the claims of other

putative collective action members.

Second, this Court has already determined the legal consequences attendant to Plaintiff's

signature on the Independent Contractor Services Agreement.  (*See* Docket Nos. 79 & 80).

Plaintiff's deposition testimony – and the other items in the record of evidence before this Court

– demonstrate the weakness of his claim.[19]  In these circumstances, where "the class representative's claim is extremely weak, this is an independent reason to doubt the adequacy of his representation …" *Robinson v. Sheriff of Cook County,* 167 F.3d 1155, 1157 (7th Cir. 1999). Thus, "[o]ne whose claim is a loser from the start knows that he has nothing to gain from the victory of the class, and so he has little incentive to assist or cooperate in the litigation; the case is then a pure class action lawyer's suit." *Id.* In the present case, the situation is no different.[20]

Third, the record of evidence before this Court shows that the indicia of an employer/employee relationship under the FLSA is absent.  (Saad Decl. at ¶¶ 15-22).  This evidence shows that Plaintiff was an independent contractor per the agreement he signed with Delta-T and his filing of tax returns as an independent contractor.  (P. Dep. Tr. at 59-60; 67-68; 71; 79; 81-82; 85-87; 109; 114-115).

**D.      This Court Should Deny Plaintiff's Motion For The Additional And Independent Reason That Fairness And Procedural Considerations Make A Collective Action Improper**

**1.      Plaintiff's Proposed Collective Action Is Unmanageable**

In order to grant Plaintiff's motion, this Court must satisfy itself that the case is "manageable as a collective action."  *Saleen*, 2009 U.S. Dist. LEXIS 49891, *7.  This is because federal district court judges appreciate that it "would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter

---

[19]  Delta-T intends to move for summary judgment as to Plaintiff's FLSA claim after this Court's disposition of the present motion.

[20]  Delta-T has filed contemporaneously a Motion to Strike various opt-in declarations submitted by Plaintiff's counsel.  As reviewed in detail in that filing, the declarations submitted by Plaintiff's counsel – insofar as the declarations have identical verbiage stating that each declarant believes they are an employee (as opposed to an independent contractor) of Delta-T – are contradicted by the resumes of these same opt-in declarants which they posted on Careerbuilder.com and Monster.com (wherein each opt-in declarant stated unequivocally that they were independent contractors of Delta-T).  (*See* Exs. E-1 to E-13).

should not proceed as a collective action because the class members are not similarly situated."
*Freeman*, 256 F. Supp. 2d at 945. According to the Third Circuit, manageability concerns are a critical component of multi-party class litigation, since the determination of how a case will be tried is significant in the certification context; in addition, the need for this analysis is heightened because certification has the potential to place unwarranted pressure on defendants to settle non-meritorious claims. *Hohider v. United Parcel Services, Inc.*, No. 07-4588, 2009 U.S. App. LEXIS 16395, *84 (3d Cir. July 23, 2009) (in analyzing certification issues, "a critical need is to determine how the case will be tried"); *In Re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 310, 320 (3d Cir. 2008) (noting that certification is "pivital" as it can "create unwarranted pressure to settle non-meritorious claims" and thus as the certification analysis "often bestows upon plaintiffs extraordinary leverage," "its bite should dictate the process that precedes it").

As discussed above, it would be virtually impossible to apply the fact-specific individualized economic realities test on a collective basis. Given the reasoning behind the Supreme Court's decision in *Hoffman-LaRoche v. Sperling*, 493 U.S. 165 (1989), a collective action is improper if the factual differences underpinning each independent contractor's claim predominate over common issues and facts. One of the benefits the Supreme Court recognized for allowing claimants to proceed as a collective action is that it allowed an efficient resolution, in a single proceeding, of common issues of law and fact arising from the same activity. *Id.* at 170.

This Court is duty bound to confront these issues now in analyzing the manageability factor. To that end, if this case were to go to trial as a collective action, the factual differences between Plaintiff and the potential collective action members could very well result in entirely opposite outcomes. One of the overarching goals of a § 216 (b) case is to ensure that all opt-ins

42

are bound by the decision based on the testimony and facts of the representative plaintiff.  Where factual differences, however, arise between the circumstances of a plaintiff and the opt-ins, the decision in the § 216 (b) trial would not produce a *res judicata* effect and it would prohibitively unfair to bind all of the opt-ins to a verdict based on a single named plaintiff.  *See Bayles v. Am. Med. Response of Colorado, Inc.*, 950 F. Supp. 1053, 1065 (D. Colo. 1996) ("A collective action is designed to permit the presentation of evidence regarding certain representative Plaintiffs that will serve as evidence for the class as a whole.  It is oxymoronic to use such a device in a case where proof regarding each individual Plaintiff is required to show liability."); *Roussell v. Brinker International, Inc.*, No. 05-3733, 2008 U.S. Dist. LEXIS 52568, *93 (S.D. Tex. July 9, 2008) (decertifying a collective action based on factual differences of plaintiffs because "if the jury were to conclude that some of the testifying opt-in plaintiffs were coerced while others were not, its is not at all clear how those findings would be attributed to non-testifying opt-in Plaintiffs"); *Johnson, et al. v. Big Lot Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008) (decertifying a collection action based partially on procedural and fairness considerations because "it would be an injustice to proceed to a verdict on the merits that results in a binding class wide ruling based on such disparate evidence").

The unique circumstances of this case make it unmanageable for the additional reason that the behavioral healthcare professionals are not registered with a single entity, but instead with either Delta-T or one of its affiliates.  This would give rise to fact-intensive inquiries not only regarding the relationship between Delta-T and those affiliates, but also the question of whether this Court will even have jurisdiction over those entities (many of whom have no minimum contacts with Pennsylvania sufficient to support personal jurisdiction).  These inquires further undermine the idea that a collective action is manageable, particularly when one

43

considers the fact that there are 12 different entities with whom behavior healthcare professionals are registered.  *See*, *e.g.*, *Maddock v. KB Home, Inc.*, 248 F.R.D. 229, 246-47 (D.C. Cal. 2007) (denying certification and noting that where plaintiff alleged that parent and various operating subsidiaries violated the FLSA, "[t]he issue of whether KB Homes meets the definition of an 'employer' or 'joint employer' under the FLSA and California law further demonstrates that common issues do not predominate …").

> ### 2.      This Case In Also Unmanageable As A Collective Action Because Forcing Delta-T To Defend It Would Violate Its Constitutional Rights

Plaintiff seeks to recover money damages on behalf of others through § 216 (b). However, it is axiomatic that the FLSA does not authorize relief to someone who has not suffered a violation of the statute.  Such recovery is a denial of due process to the defendant when the result is the payment of damages to those who cannot show they have been harmed. *See Exxon Shipping Co. v. Baker*, 120 S.Ct. 2605 (2008); *Philip Morris v. Williams*, 549 U.S. 346 (2007); *State Farm v. Campbell*, 528 U.S. 408 (2003).  To award damages to members of the putative collective action class – based on Plaintiff's testimony about his own individual circumstances – would cause constitutional harm to Delta-T.  *See BMW v. Gore*, 517 U.S. 559 (1996); *McLaughlin v. American Tobacco*, 522 F.3d 215, 231 (2d Cir. 2008).  It would offend due process and violate the Rules Enabling Act, 28 U.S.C. § 2072 (b).  *See, e.g., McLaughlin*, 522 F.3d at 231 (in reversing class certification order which would have allowed individuals injured by the marketing of light cigarettes to collect damages on a class-wide basis, the Second Circuit determined that such an "aggregate determination is likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm caused by defendants; "for these reasons, the Second Circuit determined that "[t]his kind of disconnect

44

offends the Rules Enabling Act" because "[r]oughly estimating gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter Defendant's substantive right[s].").

> **3.     This Court Should Not Impose The Significant Burden And Costs Of A Nationwide Collective Action On The Parties**

Fairness and procedural factors also weigh against proceeding as a collective action. Judicial economy is not served by joining disparate claims together, as it quickly becomes "a monster that no one can deal with." *EEOC v. MCI Int'l, Inc.*, 829 F. Supp. 1438, 1445-46 (D.N.J. 1993). Furthermore, certification of a class is a serious matter, since, by its very nature, class litigation "can alter the usual dynamics of litigation and bring to bear on defendants … intense pressure to settle." *American National Fire Insurance Co. v. York County*, No. 08-2439, 2009 WL 2385464, *1 (1st Cir. Aug. 5, 2009). Thus, federal judges acknowledge in considering §216 (b) motions that they have "a responsibility to avoid 'stirring up' of litigation through unwarranted solicitation" when it is apparent that the putative collective action members are not similarly situated and their claims cannot be adjudicated on a representative basis. *Freeman*, 256 F. Supp. 2d at 944.

The unreasonable costs and burdens associated with class-wide notice and discovery also make adjudication of Plaintiff's claims in a collective action unfair and inefficient. A growing number of federal courts have been "unwilling to expose Defendants to the burdens and costs necessarily imposed by the discovery process." *Dreyer v. Altchem Env. Servs. Inc., et al.*, No. 06-2393, 2006 U.S. Dist. LEXIS 93846, *7 (D.N.J. Dec. 12, 2006) (denying plaintiff's motion for conditional certification); *Saleen*, 2009 U.S. Dist. LEXIS 49891, *30 (holding that a collective action would not be proper because the "size and expense of the case … is an inefficient method of proceeding"); *Basco, et al. v. Wal-Mart Stores, Inc., et al.*, No. 00-3814,

2004 U.S. Dist. LEXIS 12441, *14 (E.D. La. July 2, 2004) ("To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for the same prior to its certification would be an exercise in futility and wasted resources for all parties involved").  As the court in *Saleen*, 2009 U.S. Dist. LEXIS 49891, *29, aptly observed, "the expense of sending out notice to the putative collective members, the substantial widening of discovery, and the burden on the courts of administering thousands of claims brought by opt-ins nationwide" were sufficient reasons to deny the plaintiff's motion for conditional certification.

Indeed, with thousands of potential opt-ins requiring individualized inquiries into their relationship with Delta-T and the economic realities of their relationships with clients they serve, the costs of class-wide notice and discovery will mount rapidly and impose burdensome costs on all parties and this Court's docket.  In addressing the clear and obvious differences between Plaintiff and the opt-ins at this early stage, this Court will spare itself and both parties considerable expense.

### E.     Delta-T's Response To The Internal Revenue Service And Department Of Labor Audits Do Not Support Plaintiff's Claim That Putative Collective Action Members Are Similarly Situated

In an effort to deflect attention from his failure to establish that potential collective action members are similarly situated, Plaintiff argues that Delta-T's representations to government agencies that it treated healthcare professionals in a similar fashion, *i.e.,* as independent contractors, precludes Delta-T from arguing that these professionals are not similarly situated for purposes of FLSA conditional certification.  Plaintiff's assertion is non-sensical and contrary to case law.

Like many companies, Delta-T underwent audits from the Internal Revenue Service in 2000 and the Department of Labor from 2006 to 2008.  Neither audit resulted in any adverse

determination against Delta-T for treating healthcare professionals as independent contractors; in fact, the IRS issued a no change letter meaning that the Treasury Department took no issue with Delta-T's business model.  (S. McAndrews Decl. ¶ 23); Ex. I (DOL no cause letter).  In response to these company-level audits, Delta-T explained that it treated independent contractors similarly for purposes of its business as a referral agency for independent contractors only.  That has absolutely no bearing on whether individual independent contractors are similarly situated to one another.  *See, e.g.*, *In Re Wells Fargo Home Mortgage*, 571 F.3d at 958; *Vinole*, 571 F.3d at 946. The issue at hand is whether Plaintiff will be allowed to litigate this matter as an FLSA collective action.  Thus, the inquiry is not Delta-T's response to the DOL's letter, but rather whether putative collective action members are similarly situated, which they are not.  The Court should disregard this argument as an irrelevant diversion from the real issues at hand.  Not only does Plaintiff not offer any legal support for its claims, but his argument is completely off base from a common sense perspective.

47

**V.      Conclusion**

      For the foregoing reasons, Plaintiff's Motion For FLSA Conditional Collective Action

Certification And Judicial Notice should be denied.

**DATED: August 31, 2009**          Respectfully submitted,
                                  DELTA-T GROUP, INC.

                                  By /s/ Gerald L. Maatman, Jr.
                                  One of Its Attorneys

                                  Gerald L. Maatman, Jr. (*admitted pro hac vice*)
                                  gmaatman@seyfarth.com
                                  Devjani Mishra
                                  dmishra@seyfarth.com
                                  Kenneth Sulzer (*admitted pro hac vice*)
                                  ksulzer@seyfarth.com
                                  Brandon L. Spurlock (*admitted pro hac vice*)
                                  bspurlock@seyfarth.com

                                  SEYFARTH SHAW LLP
                                  620 Eighth Avenue
                                  New York, New York 10018
                                  212-218-5500
                                  212-218-5526 (fax)

CH1 11793705.2

## CERTIFICATE OF SERVICE

I certify that on this date I caused a copy of the foregoing Defendant's Memorandum In Opposition To Plaintiff's Motion For FLSA Conditional Collective Action Certification and Judicial Notice to be served upon the following counsel of record by the Court's Electronic Filing System, which would then electronically notify the following CM/ECF participants on this case:

> Paul J. Lukas
> lukas@nka.com
> Michele R. Fisher
> fisher@nka.com
> Rebekah L. Bailey
> bailey@nka.com
> Nichols Kaster, PLLP
> 4600 IDS Center
> 80 South Eighth Street
> Minneapolis, MN  55402
> (612) 256-3200 (Main)
> (612) 215-6870 (Fax)
>
>
> Laura Carlin Mattiacci
> mattiacci@consolelaw.com
> Console Law Offices, LLC
> 1525 Locust Street
> 9th Floor
> Philadelphia, PA  19102
> (215) 545-7676 (Main)
> (215) 565-2854 (Fax)

Dated: August 31, 2009

/s/ Gerald L. Maatman, Jr.
Gerald L. Maatman, Jr.

49